265 U.S. 533 (1924)
UNITED STATES AND INTERSTATE COMMERCE COMMISSION
v.
NEW RIVER COMPANY ET AL.
SLAB FORK COAL COMPANY ET AL.
v.
NEW RIVER COMPANY ET AL.
Nos. 627 and 628.
Supreme Court of United States.
Argued April 24, 1924.
Decided June 9, 1924.
APPEALS FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA.
*534 Mr. Blackburn Esterline, Assistant to the Solicitor General, with whom Mr. Solicitor General Beck was on the brief, for the United States.
Mr. George T. Bell for appellants in No. 628.
Mr. James W. Carmalt, with whom Mr. Addison C. Burnham and Mr. August G. Gutheim were on the brief, for appellees.
Mr. J. Carter Fort, with whom Mr. P.J. Farrell was on the brief, for the Interstate Commerce Commission.
MR. JUSTICE BUTLER delivered the opinion of the Court.
This suit was brought by the appellees against the Chesapeake & Ohio Railway Company and the Virginian Railway Company, competing interstate carriers by railroad, the United States and the Interstate Commerce Commission to enjoin the carriers from applying a certain rule (Rule 4 of Circular CS-31, Revised) for the distribution of coal cars and to set aside the decision and order of the Commission of December 11, 1922, in certain proceedings instituted by the appellees against the defendant carriers.
For convenience, a mine served by one carrier is called a "local mine", and a mine served by two or more carriers a "joint mine". Each appellee is the operator of a joint mine served by the defendant carriers, and each appellant mining company is the operator of a local mine *535 served by one or the other of the carriers. The car service rules were promulgated to govern uniformly the "ratings" of coal mines, other than anthracite, and car distribution to such mines during periods of car shortage. The daily rating of a local mine for any month is based on its tonnage shipped during the preceding month, and is identical with its daily capacity to produce coal. The rating of a joint mine is calculated in the same way that the daily rating of a local mine is determined, except that its shipments over all carriers serving it are considered in determining its total capacity to produce coal. The figure so ascertained is called the "gross daily rating," in recognition of the fact that the rating of a joint mine does not represent its capacity to ship over each carrier on days when it uses more than one, but on the contrary represents its total daily capacity to ship over all lines which serve it. Rule 4 provides: "Copies of orders for cars for a mine that is joint with any other carrier (steam, electric, or water) shall be filed with a designated representative of each such carrier. Such combinations must not exceed the gross daily rating of the mine". Under the rules, when a mine orders less than its rating, distribution to it is on the basis of its orders.
These rules were established during the period of federal control of the railroads. After the expiration of that period, the Commission issued a notice, dated March 2, 1920, recommending to carriers and shippers that the rules be continued in effect until experience and further study demonstrated that others would be more effective and beneficial. They were continued by carriers generally. July 8, 1920, the Chesapeake & Ohio Railway Company and the Virginian Railway Company asked for permission to discontinue rule 4 and to substitute for it the "150 per cent. rule", which the Commission in 1912 had found to be a reasonable rule for the Illinois Central Railroad Company (In re Irregularities in Mine Ratings, 25 *536 I.C.C. 286, 295), but which had never been followed by the railroads generally or by the defendant carriers. Under this rule, a joint mine may order 100 per cent. of its gross daily rating from either carrier serving it and is entitled to receive its pro rata share of that carrier's available cars. If it so orders, it is not entitled to any cars from the other carrier. In this respect, it does not differ from rule 4. However, if a joint mine served by two carriers orders cars from both on the same day, it is entitled to order from each carrier 75 per cent. of its gross daily rating, making its combined orders 150 per cent., but subject to the limitation that it is not entitled to receive in the aggregate more than its gross daily rating. The Commission declined to give permission to substitute the 150 per cent. rule for rule 4.
January 11, 1921, appellees filed separate complaints with the Commission against the Chesapeake and Ohio Railway Company and against the Virginian Railway Company, attacking rule 4 as unjust and unreasonable and unduly prejudicial to joint mines and unduly preferential of local mines. Certain operators of joint mines intervened in support of the complaints. Certain operators of local mines intervened in support of rule 4. The complaints were consolidated with each other and with similar complaints. June 21, 1921, Division 5 of the Commission reported as follows: ". .. We find that rule 4 of Circular CS-31, Revised, is unreasonable and unduly prejudicial to joint mines and unduly preferential of local mines, to the extent that it limits the aggregate orders of the joint mine to 100 per cent. of its rating from both roads; and that for the future during periods of car shortage defendants should distribute cars to the joint mines on their lines here considered on the basis outlined in the Illinois Case [In re Irregularities in Mine Ratings, supra] . . ." Fairmont & Cleveland Coal Co. v. Baltimore & Ohio R.R. Co., 62 I.C.C. 269, 276. The Commission *537 referred to its authority under § 1 (13) of the Interstate Commerce Act by general or special orders to require carriers by railroad to file their rules and regulations with respect to car service, and to direct that such rules and regulations be incorporated in the schedules showing rates, fares and charges for transportation, and be subject to the provisions of the act relating thereto; and added, "We have not required that car service rules be filed as tariff schedules. We will not in this proceeding direct that the rules which we herein find to be reasonable be so filed. We shall expect, however, that defendants will promptly amend their car service rules so as to conform with our findings and evidence same by filing copies thereof with us." No formal order was entered, but the defendant carriers amended their rules to conform to the findings in the report, and put in force and applied the 150 per cent. rule.
Subsequently, on petition of the intervening operators of the local mines, the case was reopened and considered by the full Commission. December 11, 1922, it reversed the findings of Division 5 and found that rule 4 was not unreasonable or unduly prejudicial. Bell & Zoller Coal Co. v. Baltimore & Ohio Southwestern R.R. Co., 74 I.C.C. 433. It said: "Our former conclusions in the Fairmont Case, based upon a mistaken adherence to and extension of the decision in the Illinois Case, are reversed." The Commission made a formal order, reciting that it had "made and filed a report containing its findings of fact and conclusions thereon, which said report is hereby referred to and made a part hereof: It is ordered, That the complaints in these proceedings be, and they are hereby, dismissed." Following the report and order, the Chesapeake & Ohio Railway Company and the Virginian Railway Company gave notice to the appellees that they would put rule 4 in effect again.
*538 Thereupon this suit was brought. The complaint alleged that the carriers put the rule in effect because of the order of the Commission, and in fear of the penalties imposed by law for violation of its orders. It attacked the order and rule on the ground that they are beyond the power which the Commission can constitutionally exercise; and are in excess of the power conferred upon it by statute; and that they are arbitrary and unreasonable. The Chesapeake & Ohio Railway Company answered that the effect of the order upon it was necessarily the same as though the order had been in affirmative form, requiring it to cease and desist publishing and observing the Illinois rule (150 per cent. rule) and in lieu thereof to publish and observe rule 4; and that, facing the danger of suits for heavy damages, supported by a decision and reparation orders which it believed would follow its failure to observe the rule prescribed by the Commission, it undertook to cancel the existing rule and to restore rule 4. The Virginian Railway Company answered that in the matter of distribution of cars, it was subject to the orders of the Commission, and that the Commission having decided that rule 4 is not unreasonable or unduly prejudicial, and in the same decision having expressly reversed its conclusion in the Fairmont Case, that company considered itself legally bound to put rule 4 in effect on its railroad. The United States and the Interstate Commerce Commission moved to dismiss the complaint for want of jurisdiction and want of equity. The interveners moved to dismiss and later answered.
The case was presented to and heard by a court of three judges. Act of October 22, 1913, c. 32, 38 Stat. 220. The operation of the order of the Commission was stayed and suspended. After trial, final decree was entered setting aside the Commission's order and rule 4 and enjoining the United States, the Commission and the defendant carriers from restricting the rights of appellees in accordance *539 with the order and rule or through any other order or rule to the same effect. 293 Fed. 460. The United States and the Interstate Commerce Commission appealed. No. 627. The interveners appealed. No. 628. The carriers did not appeal.
The questions for decision are: Whether the order was subject to review by the District Court; and, if so, whether it should be set aside.
1. The District Courts have jurisdiction over "cases brought to enjoin, set aside, annul, or suspend in whole or in part any order of the Interstate Commerce Commission." Act of June 18, 1910, c. 309, 36 Stat. 539; Judicial Code, § 207, Act of March 3, 1911, c. 231, 36 Stat. 1148; Act of October 22, 1913, c. 32, 38 Stat. 219. The appellants contend the order is negative and therefore not subject to review by the court. They cite Procter & Gamble Co. v. United States, 225 U.S. 282; Hooker v. Knapp, 225 U.S. 302, and Lehigh Valley R.R. Co. v. United States, 243 U.S. 412. In the first of these cases, application was made by the Procter & Gamble Company, a shipper and owner of tank cars, to be relieved from paying demurrage charges, in accordance with demurrage rules applied by the carrier. The Commission dismissed the complaint. As shown by the report (19 I.C.C. 556, 560), the reason for dismissal was that the tank cars were made subject to the demurrage rules, by an arrangement between the shipper owning the cars and the carrier hauling them. The question before this Court (p. 292) was whether the Commerce Court had power to exert its own judgment by originally interpreting the administrative features of the Act to Regulate Commerce, and upon that assumption to treat the refusal of the Commission to grant the relief prayed for as an affirmative order, and accordingly to pass on its correctness. Hooker v. Knapp and Lehigh Valley R.R. Co. v. United States were decided on the authority of the Procter & Gamble Case. *540 The opinion in that case, when viewed in the light of the report of the Commission, furnishes no support for appellants' contentions here. In all of these cases, affirmative relief sought was denied by the Commission. Judicial review was refused on that ground. The taking of jurisdiction in such cases would involve determination by the courts whether relief denied by the Commission, in the exercise of its powers, should be granted. See The Chicago Junction Case, 264 U.S. 258. The authority conferred upon the Commerce Court by § 207 of the Judicial Code was vested in the District Courts by the Act of October 22, 1913, and, like the authority previously exercised by the Federal Circuit Courts, is confined to determining whether the Commission's order violates the Constitution, or exceeds the power delegated by statute, or is an exercise of power so arbitrary as virtually to transcend the authority conferred. Kansas City Southern Ry. Co. v. United States, 231 U.S. 423, 439; Manufacturers Ry. Co. v. United States, 246 U.S. 457, 483, 489. See also Interstate Commerce Commission v. Illinois Central R.R. Co., 215 U.S. 452, 470; Interstate Commerce Commission v. Union Pacific R.R. Co., 222 U.S. 541, 547; Intermountain Rate Cases, 234 U.S. 476, 490; Skinner & Eddy Corporation v. United States, 249 U.S. 557, 562.
The mere fact that the order of the Commission dismisses the complaint of shippers against rule 4 does not make it a negative order. That rule, promulgated during federal control, was continued in effect upon the recommendation of the Commission until it decided, June 21, 1921, that the rule was unduly prejudicial to joint mines and unduly preferential of local mines, and that the carriers should distribute cars to joint mines on the basis of the 150 per cent. rule. The Commission refrained from making an order that the rule be filed as a tariff schedule, but announced that it expected the carriers *541 promptly to amend their car service rules to conform with its findings. Accordingly, the carrier ceased to apply rule 4 and applied the 150 per cent. rule in its place. When the case was reopened before the Commission, the contest was between the operators of local mines attacking the 150 per cent. rule and the operators of joint mines supporting that rule and objecting to rule 4. The Commission reversed its former findings and decided in favor of rule 4 and dismissed the complaints assailing that rule. The order expressly includes the findings and conclusions stated in the report. It is not merely negative. Clearly, the order permits and authorizes the carriers to apply rule 4. If that rule is illegal, as alleged, such permission and authority will not sustain it, and suit will lie to set it aside. The Chicago Junction Case, supra. Plainly it was the intention and purpose of the Commission that rule 4 should be applied in place of the 150 per cent. rule. The effect of the order is to grant the relief sought by the operators of local mines. We hold that the District Court had jurisdiction.
2. Appellees contend that each operator of a joint mine has a legal right to its fair share of the car supply of each carrier serving the mine; that the operator on any day may offer the prospective output of the mine to any carrier serving it and is entitled on that basis to its share of the carrier's available cars, and that, if any portion of the output remains, the operator may offer it to the second carrier and is entitled to a fair share of that carrier's available cars. This practice is forbidden by rule 4, approved by the order of the Commission. The court below held the order invalid as discriminatory in that it deprived the operator of a joint mine of an advantage to which it has a legal right.
The Interstate Commerce Act confers power on the Commission to regulate the distribution of cars. See § 1, (3), (4), (6), (10), (11), (12), (14); § 3 (1); § 15 (1). *542 And its jurisdiction over the subject is exclusive. Interstate Commerce Commission v. Illinois Central R.R. Co., supra, 472; Baltimore & Ohio R.R. Co. v. Pitcairn Coal Co., 215 U.S. 481, 493; Morrisdale Coal Co. v. Pennsylvania R.R. Co., 230 U.S. 304, 313; Pennsylvania R.R. Co. v. Puritan Coal Co., 237 U.S. 121, 131, 133; Pennsylvania R.R. Co. v. Clark Coal Co., 238 U.S. 456, 468; Pennsylvania R.R. Co. v. Stineman Coal Co., 242 U.S. 298, 300. The courts will not review determinations of the Commission made within the scope of its powers or substitute their judgment for its findings and conclusions. Interstate Commerce Commission v. Illinois Central R.R. Co., supra, 470; Interstate Commerce Commission v. Union Pacific R.R. Co., supra, 547; Kansas City Southern Ry. Co. v. United States, supra, 456; United States v. Louisville & Nashville R.R. Co., 235 U.S. 314, 320; Manufacturers Ry. Co. v. United States, supra, 488.
Under rule 4, an operator of a local mine is entitled on the basis of its daily rating to its pro rata share of the available cars of the carrier serving it. An operator of a joint mine is not confined to any one carrier serving it. It may order from each carrier, but the total number of cars ordered may not exceed the gross daily rating of the mine. It may select the carrier which at the time has the better car supply and receive its pro rata share of that supply according to its gross daily rating, based on its capacity to ship by all carriers. It may choose between the carriers to secure the service, connections and markets it desires to have. The determination of the Commission in favor of rule 4 cannot be said to be so arbitrary or unreasonable as to transcend the power conferred upon it in respect to car distribution. The contention that the order of the Commission deprives operators of joint mines of their property without due process of law is without merit.
Decree reversed.
*543 MR. JUSTICE McKENNA, dissenting.
Let me state the proposition of the opinion denuded of the confusion of its words. It is that the owner of property  a "joint mine," to use the designation of the case  having available to him the car facilities of two carriers, must yield his advantage or some of it to the owner of a "local mine" (to use the designation of the case) who is not so situated.
I am unable to assent and yet I hesitate to dissent,  certainly hesitate to do so by unsupported declaration. I am, however, puzzled to go beyond declaration. Exposition seems to be that of demonstrating the certainty and self-evidence of an axiom. The doctrine of the opinion is that the Interstate Commerce Commission, and this Court in sustaining it, can take from property an attribute, almost as tangible an attribute as its physical substance  that is, its position, that which avails and makes wealth of its products. This, in my opinion, is a deprivation of property. I repeat, to have it intimately in our attention and estimation, that the doctrine of the opinion is that the owner of a "joint mine" may not avail of the cars accessible to his situation  cars of two carriers  only in a degree  he must yield in other degree the full advantage of his position to the owner of a "local mine" that the latter may have accommodation. And why? Is it the dictate of public interest? And if public interest may so dictate, may it not dictate other constituents and conditions of property,  whatever contributes to its value and is formidable to a competitor?
Position of property is as much a constituent of its value as its composition. A market for its products is as necessary as its products. There must be demand for the products and means of their supply, and both, I repeat, are attributes of property. Indeed, they constitute its value aside from its utility. Take them away or limit *544 them and you take away or limit its value  its right and exercise  its existence.
Property has adversaries in this world and different forms excite different degrees of antagonism, but we have not yet attained to that subserviency of regulation that one owner of property must surrender the advantage of his position to every other owner, giving up what is of value to him, and what was of cost to him.
And what is the justification  the interest of the public? Is it an exercise of eminent domain? Under the fundamental law it is a condition of the exercise of eminent domain that it recompense the detriment it causes or the property it takes. This would seem so elementary as to require no exposition. If one property owner may be required to share his means of reaching markets with another property owner, why not the markets; and having customers of a definite portion of the alphabet, be required to remand the rest of it to other property owners?
One residing in this town should need no illustration of the advantage of position. One can not step out on the streets without having thrust upon him the evidence of the eager push of business to advantageous positions, recognizing their value and paying with eager competition the increase of price.
According to the doctrine of the opinion, the inducement does not exist in a coal mine, but whatever advantage of instrumentalities it has it must share in the public interest with a competitor. If so, why not all instrumentalities  those it owns as well as those that by its position it is able to obtain.
Nor is the proposition of the opinion justified because it is the disposition of an instrumentality of a public service corporation. I repeat, that an owner of property is entitled in the exercise of his rights and satisfaction of his needs to demand service of the carriers to which he *545 has relation according to his rights and needs, and in the order of their requisition, and the ability of the carrier.
I concur in the reasoning of Commissioner Potter. "We may not restrict the use of transportation facilities in order to equalize mine operation. To do so would be to require discrimination in the use of equipment  not remove it. If a local mine is at a disadvantage it is not because of a transportation problem with which we may deal. . . ."
The question in the case is made obscure by an attempt at its simplification. It seems the prompt assurance of self evidence that a mine owner with the facilities of two railroads may order such number of cars from both railroads as he may need, this being a right relative to his property, indisputably an element of its value, represented in its price and the cost to him.
I think, therefore, the decree should be affirmed.