CHESAPEAKE & O. RY. CO. v. UNITED STATES et al. (INTERSTATE COMMERCE COMMISSION, Intervener.)

District Court, S. D. West Virginia.
November 16, 1929.

Herbert Fitzpatrick, of Huntington, W. Va., and Robert B. Tunstall, George H. Gardner, and Thomas L. Preston, all of Richmond, Va., and Fitzpatrick, Brown & Davis, of Huntington, W. Va., for complainant.

James Damron, U. S. Dist. Atty., of Huntington, W. Va., and Elmer B. Collins, Sp. Asst. to Atty. Gen., for the United States.

Daniel W. Knowlton and Nelson Thomas, both of Washington, D. C., for intervener.

John H. Holt, of Huntington, W. Va., Robert E. McCabe, of Charleston, W. Va., D. Lynch Younger, of Washington, D. C., and Theodore W. Reath, of Philadelphia, Pa., for defendants Guyandot & T. R. Ry. Co. and Norfolk & W. Ry. Co.

Before NORTHCOTT, Circuit Judge, and BAKER and McCLINTIC, District Judges.

McCLINTIC, District Judge. The Chesapeake & Ohio Railway Company (hereinafter referred to as the C&O), filed its petition in this court against the United States of America, Guyandot & Tug River Railway Company and Norfolk & Western Railway Company, under the provisions of the Urgent Deficiencies Act Oct. 22, 1913 (38 Stat. 208, 219), to set aside and annul that portion of the certificate and order of the Interstate Commerce Commission authorizing the Guyandot & Tug River Railway Company, a subsidiary of the Norfolk & Western Railway Company, to build a line of railroad from Gilbert to Wharncliffe, in Mingo county, W. Va.

For convenience the Norfolk & Western Railway Company and its subsidiary, the Guyandot & Tug River Railway Company, will hereinafter be referred to as the N&W. The Virginian Railway Company and its subsidiary, the Virginian & Western Railway Company, while not a party to this suit, will necessarily have to be referred to many times, and for convenience will be called the Virginian.

In order to make a proper setting for the decision of this cause it will be necessary to make a rather full statement of facts, and, in doing that, it will be necessary to give a somewhat detailed description of the country wherein the proposed railroad is to be built and the connections proposed to be made therewith.

The part of the territory of West Virginia south of Kanawha and New rivers therein is underlaid with enormous quantities of coal. The C&O, N&W, and Virginian are the only railroads that haul to market the vast amount of coal shipped from the mines in that part of the state of West Virginia. The C&O, with its main line and it subsidiaries, serves that portion thereof immediately below the Kanawha and New rivers. The N&W runs along the Big Sandy river and its branch, the Tug river, which rivers form the boundary line between the states of West Virginia and Kentucky. Each of these railroads has a tidewater connection at Hampton Roads; the eastern terminus of the C&O being at Newport News, and the eastern terminus of the N&W at Norfolk, Va.

The N&W also has western connections

in the cities of Cincinnati and Columbus in the state of Ohio. The C&O has western connections in the cities of Cincinnati, Chicago, Columbus, and the Great Lakes region. The Virginian runs westerly from Norfolk, Va., to the coal fields of Southeastern West Virginia a distance of about 450 miles. Each of these railways has many branches running from their respective lines in Southern West Virginia. The branches of the Virginian are in Mercer, Wyoming, and Raleigh counties. The Virginian has no western connection of its own, and such products as originate on its line going west must be transferred either to the C&O, which connects with it at Pemberton, on one of its branch lines, or at Deepwater, on its main line, or such products must be transferred to the N&W at Matoaka, on one of its branch lines.

By a decision of the Interstate Commerce Commission (for convenience hereinafter called the ICC), which decision is found in Wyoming Coal Co. v. Virginian R. Co., 96 I. C. C. 359, and Id., 98 I. C. C. 488, and which was affirmed by the Supreme Court of the United States, Virginian R. Co. v. U. S., 272 U. S. 658, 47 S. Ct. 222, 71 L. Ed. 463, the Virginian was compelled to adopt and file joint rates with the C&O and N&W, respectively, for the coal shipped west from its line. A large number of mines located on the Virginian are likewise accessible to branch lines of the C&O, and a large number of these mines located on the Virginian can only ship coal by the Virginian. For some reason best known to the shippers, about 80 per cent. of the coal shipped west from the lines of the Virginian was routed via Matoaka and the N&W line.

There is a river called the Guyandot which has its head, with many branches, in the southeasterly portion of West Virginia, and which flows westerly into the Ohio river at Huntington, W. Va. About 30 years ago the C&O commenced the construction of a branch line from Barboursville, ten miles east of Huntington on the main line of the C&O, up this Guyandot river, and subsequently extended the same to a place called Gilbert, in Mingo county, W. Va., which point is about 90 miles from Barboursville. This line has developed an enormous coal shipment and delivers to the C&O at Barboursville, on the main line, about 35 per cent. of all the coal shipped on the C&O lines. The C&O also has a branch line which leaves the main line at Prince, in Fayette county, W. Va., and extends southeasterly to a place called Stonecoal, which point is about 55 miles from Gilbert; both places being situate on the waters of the Guyandot river. The N&W has the branch line to Matoaka, and other branch lines extending north from its main line to or near to the Guyandot river. The Virginian has its main line at a place called Mullens and another place called Elmore, on the head of the Guyandot river. The Virginian also has a line extending from Elmore down the Guyandot river to a place called Itmann. All of these lines are in what is called the New River, Tug River, and Pocahontas coal districts, and, under the decision of the ICC, carry the same freight rate on coal going west.

From the joint coal mines which are served by the C&O and the Virginian, if the coal is shipped west by the C&O, the Virginian has no division of rates. The distance from Itmann to Gilbert is about 40 miles. There is no railroad line along this river between those two points. The distance from Gilbert to Wharncliffe, on the main line of the N&W, is about 10½ miles. The valley of the Guyandot is narrow and quite mountainous between Gilbert and Mullens. The water flows through a narrow, crooked valley or gorge, in which there is but little level land. This part of the river is located a distance of 8 to 12 miles north of the N&W main line, from which it is separated by a high mountain divide. The Guyandot basin between Itmann and Gilbert is estimated to contain about 330 square miles, nearly all underlaid with coal. The coal commercially marketable and recoverable under present conditions is variously estimated to be a quantity not less than 500,000,000 gross tons and up to 1,444,000,000 short tons. It is also estimated that there is about 118 square miles of land bearing merchantable saw timber at least 12 inches in diameter, which it is thought will produce about 355,000,000 feet, board measure, of timber, nearly all hardwood.

The important resources of the region, for which all of this development is being made, are the coal and the timber, and the full exploitation thereof will require the construction of branch lines on the principal tributary creeks, notably on Clear fork, north of the river, and on Pinnacle creek, south of the river, as well as on several smaller creeks; but large areas of coal and timber can be reached from the proposed main line along the river by ordinary industrial spurs therefrom.

A company called the Pocahontas Coal & Coke Company owns a great many thousands of acres of this coal and timber land. About the end of the year 1901 the N&W purchased all the stock of the Pocahontas Coal & Coke Company, and thus is the beneficial owner of these holdings of the coal and coke com-

pany. The W. M. Ritter Lumber Company owns about 70,000 acres of this coal and timber land along the Guyandot river in this basin. There are some other owners thereof therein, but the quantities are comparatively small.

On the 7th day of May, 1925, the C&O filed its application with the ICC (Finance Docket 4818) for a certificate that the present and future public convenience and necessity require the construction by it of (a) an extension of its line of railroad, known as the Logan subdivision, from the southern terminus of said division, at or near Gilbert, easterly to a point at or near Mullens, a distance of 47⁹⁄₁₀ miles, in Mingo and Wyoming counties, W. Va.; and (b) an extension of its Winding Gulf branch from its southern terminus at or near Stonecoal westerly to a point at or near Mullens, 8²⁄₁₀ miles, in Raleigh and Wyoming counties. Permission was also requested under paragraph 18 of section 15a of the Interstate Commerce Act, as added by Act Feb. 28, 1920, § 422 (49 USCA § 15a (18) to retain the excess earnings from the proposed extensions. On October 29, 1925, the Guyandot & Tug River Railroad Company filed its application in Finance Docket No. 5161 for a certificate that the present and future public convenience and necessity require the construction by it of a line of railroad extending from a connection with the Virginian Railway at or near Elmore in a general westerly direction to Wharncliffe, 53 miles, in Wyoming and Mingo counties. The Norfolk & Western and the Virginian joined in this application. An amended application was filed December 24, 1925, which was joined in by the Norfolk & Western only. On January 21, 1927, the Virginian & Western Railway Company filed its application for a certificate that the present and future public convenience and necessity require the construction by it of a line of railroad extending from a connection with the Guyandot River branch of the Virginian Railway at or near Itmann, down the Guyandot river to a connection with the C&O at or near Gilbert, 40⁹⁄₁₀ miles, in Wyoming and Mingo counties. This application was joined in by the Virginian Railway Company. The three applications were heard together, and by a certificate and order made by the ICC on the 23d day of July, 1928, the ICC granted the application of the Virginian to construct its line from Itmann to Gilbert. It also granted the application of the N&W to build its line from Gilbert to Wharncliffe. It denied the application of the N&W as to all other matters, and denied the entire application of the C&O. 145 I. C. C. 167.

This decision was by Division 4 of the ICC. This division was unanimous in granting the Virginian its application; but one Commissioner out of the three members of such Division 4 filed a dissenting opinion and did not join in the decision granting the application of the N&W to build the short line from Gilbert to Wharncliffe. Application was made to the whole commission for a rehearing and reargument, but the same was denied, and the order of the ICC became final and was placed in full force and effect as of the 1st day of November, 1928.

It is claimed by the N&W that the line from Gilbert to Wharncliffe will develop a large quantity of coal at a point rather near to Gilbert and on the north side of the range of mountains between the Guyandot and the Tug rivers. It is claimed by the C&O that this quantity of coal could be as well or better developed by a short line from the C&O line on Guyandot river. It is shown that the line from Gilbert to Wharncliffe will cost about $2,600,000, and that development of a good bit of coal on a creek called Horsepen would require a line of railroad costing about $600,000.

The prayer of the petition is that the part of the certificate and order granting the N&W the right to extend its line of railroad from Gilbert to Wharncliffe may be enjoined, suspended, and annulled, and that the N&W may be enjoined from taking any proceedings or doing any act or thing under or pursuant to the action and order of the commission.

The pleadings in the cause consist of the petition and the exhibits therewith, which petition includes the report of the commission, 145 I. C. C. 167, the answer of the N&W, and the answer of the United States. The record includes certain evidence on behalf of the parties taken in open court and the record in full of all the evidence submitted to the ICC on the applications hereinbefore mentioned.

The petition of the plaintiff sets forth two grounds of attack upon the order of the ICC appealed from herein.

The first ground, in substance, is as follows: That the record before the ICC contained no evidence that the present or future public convenience or necessity requires or will require the construction and operation of the railroad by the N&W from Gilbert to Wharncliffe; and that, on the contrary, the evidence shows that such construction and operation are and will be contrary to the present and future public convenience and necessity.

The second ground, in substance, is as

follows: That the report of the ICC and the record show that the ICC made and entered the certificate and orders "without authority either in law or in fact, contrary to law, and arbitrarily, in that the said certificate and orders were made and entered under an erroneous conception and theory of the law applicable in such cases, and in contravention of the Interstate Commerce Act."

The plaintiff avers in this context that "no finding of fact is made in support of the said certificate and orders, and the only reasons or purported reasons assigned" by the commission "in support thereof are that the construction of the proposed line would enable the N. & W. to compete with the plaintiff for westbound traffic from the Guyandot Valley, and would assure operators in that territory competitive service to the west."

It should be borne in mind in considering these objections that the applications of the C&O, N&W, and Virginian for the opening of the west-bound outlet through the upper Guyandot river valley were heard together, and that all three applications were disposed of at one time by one order, and that the ICC, as shown by the report and order, considered and decided the proposition before it as a whole, and not by piecemeal.

In this order in question the ICC denied the application of the C&O in toto, granted the application of the Virginian in full, and denied the application of the N&W as to the line along the upper Guyandot Valley, but granted its application as to that portion of its proposed line which would connect the Virginian extension therein authorized with the N&W main line at Wharncliffe (145 I. C. C. 167). Paragraph (20) of section 1 of the Interstate Commerce Act as amended (49 USCA § 1(20), gives to the ICC power to issue a certificate for the construction of a portion of the line for the building of which a certificate is sought. The applicable portion of such paragraph is as follows: "The commission shall have power to issue such certificate as prayed for, or to refuse to issue it, or to issue it for a portion or portions of a line of railroad, or extension thereof described in the application, or for the partial exercise only of such right or privilege, and may attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require."

It will be noted that no specific limitation, restriction, or direction is found in the statute for the guidance of the ICC in the issuance of the certificates. The ICC is authorized to issue a certificate attaching "such terms and conditions as in its judgment the public convenience and necessity may require." The judgment of the ICC as to the requirements of the public convenience and necessity is the only prescribed basis in the conditions which may be attached to the certificate. Apparently the issuance of the certificate itself is in the discretion of the ICC as broadly as are the conditions which may be attached to such issuance.

■ It may therefore be fairly stated that the issuance of the single order authorizing the Virginian and the N&W to build these separate sections of the lines, which the ICC found to be necessary to a proper disposition of the traffic problem of the upper Guyandot Valley, was equivalent to the giving of a certificate to each of the applicants named for the building of the prescribed portion of the line, conditioned upon the building of the other portion. It may be fairly presumed that the ICC would not have authorized the building of either of the sections of road without the simultaneous construction of the other. In this connection attention is called to the fact that, according to the order issued, both sections were required to be completed on or before December 31, 1931, thus implying that the ICC visualized the connection of the Virginian's westward extension with the N&W simultaneously with its connection with the C&O.

That the elimination of the Gilbert-Wharncliffe branch from the plan contemplated in the order of the ICC would utterly change the situation and result in an entirely different disposition of the problem before the ICC cannot be questioned. The chief contention of the plaintiff is that the building of the Virginian extension would afford a westbound outlet for coal produced upon the Virginian line different and more desirable than those now existing, and that, with the elimination of the Gilbert-Wharncliffe construction sought to be enjoined in this suit, a much larger proportion of the west-bound coal would be carried to its ultimate destination over the C&O. The plaintiff also sets out and complains of the fact that with the building of the Gilbert-Wharncliffe connection considerable portions of this Virginian coal moving over the Virginian extension would be consigned to its ultimate destination via the N&W. This, in effect, would result in continuation of approximately the same conditions now existing.

■ The statute gives the ICC power to authorize the building of a portion of a proposed line. The ICC has power to separate and divide a line described in an application for a certificate. No authority, however, is given to the courts to separate and divide a

line authorized by the ICC in an order, and such an action by the courts would clearly constitute a substitution of the court's opinion upon the subject for that of the ICC. Certainly it cannot be doubted that if the ICC had, in one order, after the joint hearing of these three applications, seen fit to grant to the N&W the right and authority to construct the railway line down the Guyandot Valley from Itmann or a point beyond to Gilbert instead of to the Virginian, and then have granted the further application of the N&W to construct the Gilbert-Wharncliffe line, then no court would have power to separate and divide the last line from the first and enjoin its construction. The order here in contemplation of the statute must, in our opinion, be enjoined as a whole or not at all. The plaintiff in this case has so brought its suit that the order as a whole cannot here be enjoined. It is not necessary for an order to be supported by substantial evidence that every part and portion of a proposed line would be to the public interest. It is sufficient that there be substantial evidence justifying a conclusion that the plan and project as a whole would be to the public interest. No decided case can be found wherein a court has sustained the order of the ICC as to one portion of an authorized line and enjoined its effectiveness as to the other portions. The obvious reason that no court has ever attempted such action is the fact that it would in effect substitute the opinion and plan of the court for that of the ICC. Cases holding that the courts will not do this are numerous and uniform. Among the many available cases, we here append quotations from a few which set out the well-established principle.

■ The rule as to judicial review of the commission's findings and orders is stated as follows by the Supreme Court in United States v. New River Co., 265 U. S. 533, 44 S. Ct. 610, 612, 68 L. Ed. 1165, a case involving car distribution rules as applied to joint coal mines:

"The authority conferred upon the Commerce Court by section 207 of the Judicial Code [28 USCA § 41 (27) note] was vested in the District Courts by the Act of October 22, 1913, and, like the authority previously exercised by the federal Circuit Courts, is confined to determining whether the Commission's order violates the Constitution, or exceeds the power delegated by statute, or is an exercise of power so arbitrary as virtually to transcend the authority conferred. Kansas City Southern Railway v. United States, 231 U. S. 423, 439, 34 S. Ct. 125, 58 L. Ed. 296, 52 L. R. A. (N. S.) 1; Manufacturers' Ry. Co. v. United States, 246 U. S. 457, 483, 489,

38 S. Ct. 383, 62 L. Ed. 831. See also Interstate Commerce Commission v. Illinois Central R. R., 215 U. S. 452, 470, 30 S. Ct. 155, 54 L. Ed. 280; Interstate Commerce Commission v. Union Pacific R. R., 222 U. S. 541, 547, 32 S. Ct. 108, 56 L. Ed. 308; Intermountain Rate Cases, 234 U. S. 476, 490, 34 S. Ct. 986, 58 L. Ed. 1408; Skinner & Eddy Corporation v. United States, 249 U. S. 557, 562, 39 S. Ct. 375, 63 L. Ed. 772. * * *

"The courts will not review determinations of the Commission made within the scope of its powers or substitute their judgment for its findings and conclusions. Interstate Commerce Commission v. Illinois Central R. R., supra, 470 (30 S. Ct. 155); Interstate Commerce Commission v. Union Pacific R. R., supra, 547 (32 S. Ct. 108); Kansas City Southern Railway v. United States, supra, 456 (34 S. Ct. 125, 58 L. Ed. 296, 52 L. R. A. [N. S.] 1); United States v. Louisville & Nashville R. R. Co., 235 U. S. 314, 320, 35 S. Ct. 113, 59 L. Ed. 245; Manufacturers' Ry. Co. v. United States, supra, 488 (38 S. Ct. 383)."

In Manufacturers' Ry. Co. v. United States, 246 U. S. 457, at page 481, 38 S. Ct. 383, 389, 62 L. Ed. 831, the court said: "Whether a preference or advantage or discrimination is undue or unreasonable or unjust is one of those questions of fact that have been confided by Congress to the judgment and discretion of the Commission (Interstate Comm. Comm. v. Alabama Midland Ry., 168 U. S. 144, 170, 18 S. Ct. 45, 42 L. Ed. 414), and upon which its decisions, made the basis of administrative orders operating in futuro, are not to be disturbed by the courts except upon a showing that they are unsupported by evidence, were made without a hearing, exceed constitutional limits, or for some other reason amount to an abuse of power."

The court in that case further said, at page 482: * * * "It may be conceded that the evidence would have warranted a different finding; indeed, the first report of the Commission was to the contrary; but to annul the Commission's order on this ground would be to substitute the judgment of a court for the judgment of the Commission upon a matter purely administrative, and this cannot be done."

We are of opinion that there is sufficient evidence in the record, as it is, in substance, set out in the report of the ICC, covering all details of the movement of traffic and coal production in the locality involved, and this affords a basis sufficient in law to support the conclusion and order of the ICC.

■ The claim made by the plaintiff that

there is no evidence of record to support the finding of the ICC that the present and future public convenience and necessity require the construction by the N&W of that portion of its proposed line in Mingo and Wyoming counties, W. Va., extending from Gilbert to Wharncliffe, is not supported by the record. We are of opinion that there are a number of items of evidence showing this public convenience and necessity.

First. The proposed line is necessary for the development, in the future, of the coal-bearing lands tributary to such proposed line from Gilbert to Wharncliffe on Gilbert and Horsepen creeks. There is substantial evidence that in this 10½ miles from Gilbert to Wharncliffe there is a large tonnage of mineable coal which witnesses estimated to be from 120,000,000 to 175,000,000 tons, and there is evidence of witnesses to show that this can best be developed by the Gilbert-Wharncliffe line or by a short branch extending from that line up Horsepen creek. The ICC found this to be true, and we cannot substitute our judgment thereon, even if there were substantial evidence to the contrary. This will, of course, be a matter of future development, but the law authorizes the issuance of a certificate upon a finding by the ICC that the present or future public convenience and necessity require or will require such construction.

Second. The evidence shows clearly that the Gilbert-Wharncliffe line is necessary in order to accomplish economies in operating costs in connection with traffic now moving by way of other lines of the N&W, and that these economies cannot be accomplished without the construction of this short line. It must be remembered that the greater part of the traffic which is expected to move over the line which the Virginian has been authorized to construct from Itmann to Gilbert will be coal originating on existing lines of the Virginian Railway and destined to be hauled west, and which is now moving over other routes at the rate of about 4,000,000 tons a year and is expected to increase in volume. That coal originates at mines on existing lines of the Virginian which are either local to its rails or served jointly by the Virginian and C&O. From the local mines, and from the joint mines which are directly intermediate, there are joint rates by way of the rails of the Virginian in connection with both the C&O and N&W, through Deepwater and Matoaka respectively. From 27 other joint mines there are likewise joint rates in connection with the N&W by way of Matoaka, but the C&O has refused to join with the Virginian in establishing joint rates by way of

Deepwater, because it has its own rails all the way from those mines to the western markets.

The coal shippers from this region, for reasons of their own, have heretofore caused about 80 per cent. of all west-bound coal originating on the Virginian to be moved by way of Matoaka and the N&W, and the ICC, in giving its approval to the Gilbert-Wharncliffe line, has declined to deprive these shippers of the continued opportunity to use the N&W lines. If the Gilbert-Wharncliffe line is not built, then the existing routes by way of Matoaka must be continued. To the extent that the shippers continue to use the Matoaka route, the use of the Itmann-Gilbert line of the Virginian will be curtailed and the participating carriers will be unable to accomplish the operating economies which would result from the use of that route.

It further appears that, if this short line is not constructed, by reason of this possible or probable shipment of coal west over the present lines of the N&W, the Virginian would suffer great loss in not having the revenue from the shipment of this coal over the new line from Itmann to Gilbert.

Third. The construction of the proposed Gilbert-Wharncliffe line is necessary in order to preserve the existing competitive status of the N&W and C&O for the west-bound movement of coal originating on existing lines. ▇ In paragraph 4 of section 5 of the Interstate Commerce Act, as amended (49 USCA § 5 (4)), the ICC is directed, as soon as possible, to prepare and adopt a plan for the consolidation of the railroad properties of the continental United States into a limited number of systems. From that paragraph we quote as follows: "In the division of such railways into such systems under such plan, competition shall be preserved as fully as possible and wherever practicable the existing routes and channels of trade and commerce shall be maintained."

The N&W and C&O are active competitors for the shipment of this amount of 4,000,000 tons, heretofore mentioned, which now originates on the Virginian lines to the west. Naturally, the Virginian would want to have the longest haul possible of this tonnage, and would therefore like to haul it from the point of origin of each ton to the end of its line at Gilbert. Without the construction of the Gilbert-Wharncliffe line, all of this coal tonnage would have to be delivered at Gilbert to the C&O. The construction of this short line would leave the C&O and N&W upon the same competitive basis as they are at present, and would give to the Virginian what the ICC evidently thought was its rightful portion of the revenue derived from the ship-

ment of this coal. This is simply carrying out the apparent public policy indicated by Congress by the passage of the Interstate Commerce Act.

It is claimed by the plaintiff that the C&O affords the "natural" and most economical route for the movement west from Gilbert, and characterizes the proposed Wharncliffe route as a "poor" one, having "heavy grades" and being uneconomical and wasteful, but the ICC evidently found to the contrary, and in our opinion, when all the facts are taken into consideration, there is no doubt about the rightfulness of its conclusions. It is true that the grade from Gilbert over the proposed route to Wharncliffe is greater than any grade over the C&O lines from Gilbert to Kenova, but the ICC evidently took into consideration many other matters affecting it and reached the conclusion that, on the whole, this was not a sufficient reason to refuse the certificate granting the right to construct this short line. We deem it unnecessary to go into all the details relative to this objection. The ICC certainly reached the conclusion that the construction of the Gilbert-Wharncliffe line should be authorized to preserve both routes on an equal competitive basis.

Fourth. The ICC was evidently of the opinion that the construction of the new short line was necessary to enable the N&W to participate in the coal, lumber, and other traffic originating along or destined to points on the new line to be built by the Virginian from Itmann to Gilbert. The language of the ICC on this point is as follows: "The construction of that part of the N. & W. proposed line from Wharncliffe to Gilbert would enable the N. & W. to compete with the C. & O. for westbound traffic from the Guyandot valley, and would assure operators in this territory competitive service to the west. The N. & W. might be disposed to permit the exploitation of the lands of the Pocahontas Company, provided it receives the westbound tonnage therefrom at Wharncliffe."

As heretofore set out, the N&W is the owner of a very great acreage of land in the Guyandot Valley and has been such owner for at least 28 years, and had contemplated developing the same whenever the necessity therefor should appear, and has spent a large sum of money in maintaining rights of way and in engineering and other matters necessary for the proposed construction of a railroad in the Guyandot Valley, and the declared purpose of the purchase of this large quantity of land was to make the N&W "secure in its coal and coke traffic which already forms so large a portion of the company's business." If the N&W refused to permit the develop-

ment of its lands in this valley unless all the products thereof that go west were returned east to its branch line at Matoaka and then hauled west over its main line, it would seriously interfere with the expected business of the Virginian Railway and would be an uneconomical way of taking these products to market. The ICC evidently reached the conclusion that, by the burden of the ownership of this large body of land for this great length of time, certain rights accrued to the N&W, and in our opinion equity, at least, requires agreement with such conclusion.

The desirability of competitive service for the purpose of hauling the products of this Guyandot Valley to market certainly seems to have been considered by the ICC in awarding the certificate for the construction of the Gilbert-Wharncliffe line, and it seems to us that the fact that it was so considered is clear from its report.

Fifth. The ICC evidently considered that the new line from Gilbert to Wharncliffe was necessary to prevent the bottling-up of the Virginian by having only one active western outlet. As heretofore shown, the Virginian is a trunk line railroad extending from Hampton Roads, Va., to and ending into the coal fields of Southern West Virginia. The ICC, in the case of Control of Virginian Railway, 117 I. C. C. 67, refused to approve the proposed lease of its properties to the N&W. We think that the right construction of this act of the ICC is to believe that the Virginian should be preserved independently of the two other major coal-carrying lines in that vicinity.

The ICC also required. (Virginian Railroad v. United States et al., 272 U. S. 658, 47 S. Ct. 222, 71 L. Ed. 463) " * * * the establishment of joint rates on coal to the west and the evidence in the case was that that traffic is or will in the future be an important part of the Virginian's total traffic."

The ICC, by awarding the certificate for the Itmann-Gilbert line to the Virginian, apparently endeavored to give it a more suitable and effective outlet to the west. But it would still be bottled up if the only connection at Gilbert was with the C&O, and the authorization of the Gilbert-Wharncliffe line seems to have been a means, in the minds of the members of the commission, to prevent such condition. The ICC evidently considered the Gilbert-Wharncliffe certificate as a corollary to the certificate awarded the Virginian, and its construction is a necessary part of the very theory and object of the ICC in the development of the Virginian as an independent trunk-line carrier.

In the report in this case the ICC lays

real stress on the fact that the coal reserves of the C&O and N&W are much greater than those of the Virginian, and also lays stress on the fact that the coal reserves of the C&O are likewise much larger than those of the N&W.

From the Ohio river, at Kenova and Huntington respectively, run the lines of the N&W and C&O southeast along the valley of the Big Sandy river and the Guyandot river. The N&W leaves the state near Bluefield (about 180 miles from Kenova), and the C&O stops at Gilbert, more than 90 miles from its main line, and there is no cross railway between them for those long distances. The same condition will prevail when the Virginian is finished from Itmann to Gilbert on its line of more than 40 miles. We are of opinion that it is to the interest of the public within that long distance to have a cross line for the purpose of carrying freight and passengers of local people from one railway to the other without the necessity of making these long hauls to the Ohio river on one railway and then back up the other when the distance between these railways in these two valleys is so short.

Believing that there is substantial evidence herein to support the certificate and order of the ICC and the power and authority to grant the certificate and enter the order complained of was lawfully lodged in the ICC, and that the action of the commission is neither in law or fact arbitrary or contrary to law or in contravention of the Interstate Commerce Act, a proper decree will be drawn and presented dismissing the petition of the plaintiff.

NORTHCOTT, Circuit Judge, and BAKER, District Judge, concur.