## Chesapeake & O. Ry. Co. v. Gorman et al.

June 8, 1945.

LeWright Browning for appellant.

O. R. Bright for appellees.

Opinion of the Court by Judge Thomas—Reversing.

The appellees, and defendants below, Charles E. Gorman and Arthur Gorman, a partnership doing business under the name of Gorman Construction Company, were constructing a section of a state highway in Floyd County, Kentucky, in 1938, under a contract they had entered into with the State Highway Commission.

An essential material in the performance of their contract was crushed rock, which was transported from a quarry located within this Commonwealth to a nearby station called Eastern on appellant's railroad traversing Floyd county. There was a depot at that place and a sidetrack, but no agent was maintained there, and it apparently had become abandoned as a station. The sidetrack of appellant at Eastern was one-half mile from the highway the appellees were constructing, and about

midway that distance was a stream, apparently immediately between two hills called "Little Beaver Creek." There was an old unballasted county road running from the station to the highway under construction which, of course, crossed Little Beaver Creek over which there was no bridge, but only a ford as a crossing. There was also a constructed footbridge considerably higher than the banks of the creek. In order to repair that half-mile of the old county road so as to enable appellees to truck the stone from the station and carry it to and spread it upon the highway they were constructing, they repaired that stretch of road, which partly consisted in laying four feet tiling in the bed of the creek in the old ford and surfacing the tiling with concrete to the height of what was supposed to be the usual and ordinary water carried by the creek.

In June, July and August of 1938 there were unusual rains in the vicinity and the territory drained by the creek, which overflowed the bridge that defendants had constructed across it for the purpose stated, and which prevented the use of trucks between the highway and the station where the cars containing the stone were spotted on the sidetrack. Appellees had therefore obtained the permission of appellant to excavate a space under the sidetrack—which was built on a dump—into which the crushed stone might be emptied from the hopper cars containing it into a conveyor placed in the opening under the track and carried it to, and deposited it in trucks, after which it was carried over the road referred to to the place of deposit on the highway which was the only one traversing that space over which vehicles might pass.

The parties were operating at all times involved in this litigation under a schedule of tariff rates (including demurrage) which appellant had previously filed with both the Federal Interstate Commerce Commission, and the Railroad Commission of Kentucky. Liability charges, as well as free time within which the consignee (defendants here) was given to unload the freight, were stipulated in the schedule filed with the Kentucky Railroad Commission, and also provisions for extending the period of free time under certain conditions, among which was "because of high water or snow drifts it is *impossible* during the prescribed free time to get to the

cars for loading or unloading." (Our emphasis.) But even under that provision the free time was only extended as therein set out. Such provisions are contained in Paragraph 1 of Section A of Rule 8 in the filed schedule. Paragraph 4 of the same Rule (No. 8) says:

"When because of floods, earthquakes, hurricanes or tornadoes, and conditions in the devastated area resulting therefrom, it is impossible for a consignor or consignee to get to or to load or unload, a car, the detention directly chargeable thereto will be eliminated in computing demurrage."

Rule 9 of the schedule prescribes that a carrier and the consignee, or consignor (as the case may be), may enter into what is called an "Average Agreement" which is explained to be that the one liable for demurrage may obtain a credit for unconsumed free time in unloading freight from cars in which it was transported and which might be credited on excess time in unloading other cars. Section E of the same Rule prescribes: "A party who enters into this Average Agreement shall not * * * be entitled to cancellation or refund of demurrage charges under Section A, Paragraph 1 of Rule 8 * * * except when bunching has been caused by floods, earthquakes, hurricanes or tornadoes and conditions in the devastated area resulting therefrom, strikes of carrier's employees etc." It is therefore seen from the quoted excerpt from Section E of Rule 9 under the Average Agreement which the parties had entered into that Paragraph 1 of Section A of Rule 8 becomes eliminated as an excuse for not paying demurrage in failing to load or unload freight within the prescribed free time. However, no part of Section E of Rule 9 eliminates the nonliability for demurrage of the consignee when the delay over and above his free time for unloading the freight was caused by the conditions set forth in Paragraph 4 of Section A of Rule 8, inserted above.

By the delay of appellees in unloading the cars they incurred liability under the schedule herein to the defendants for demurrage to the amount of $367.40 in the month of June of the year referred to, and the amount of $1,895.30 during the month of July of the same year; but the amount chargeable during the month of August was admitted by appellees and is not involved in the case.

Appellant sued appellees in the Fleming circuit court to recover the alleged demurrage due for the months of June and July. Appellees' answer denied liability for any of the amount sought to be recovered, upon the ground that inserted Paragraph 4 of Section A of Rule 8 supra relieved them of such liability. The facts, substantially as above stated, were agreed to in the filed stipulation which was signed by the parties. The cause was then submitted to the court without the intervention of a jury, and it dismissed appellant's petition, evidently upon the sole ground that the facts as hereinbefore outlined brought the case within Paragraph 4 of Section A of Rule 8 supra. Appellant's motion for a new trial was overruled from which it prosecutes this appeal.

It will be observed that by Paragraph 4 of Section A of Rule 8 of the filed schedule a consignor or consignee is relieved of liability for demurrage because of floods, earthquakes, hurricanes or tornadoes, only when such phenomena renders the devastated area *"impossible* for a consignor or consignee to *get to* or to load or unload a car."* (Our emphasis.) It does not say that exemption from the payment of demurrage will be allowed to any one guilty of the delay when the conditions enumerated were such as to disable the one liable to *transport* the freight from the terminal of the shipment to the place where it was to be employed by the consignee with either a truck or other vehicle, since the paragraph prescribed for nonliability for the causes therein outlined only when it is *impossible* for him to get to or to load or unload the freight from the car by any means adaptable to the particular freight which, as is shown in this case, is stone that could not be injured or damaged by unloading it from the car onto the ground and later carting it away when conditions permitting that to be done are restored. The method adopted by defendants in this case was one of their own choosing and which they did because it was far less expensive than any other method that could be adopted whereby the particular freight could have been unloaded, and it is a part of the stipulation that in this case it could have been done, but resulting in much more expense to the appellees. It is therefore seen that defendants were not prevented under the language of the schedule from unloading the involved freight but only prevented from unloading it by

the most practical and inexpensive method which they adopted and which they were prevented from following because of a temporary obstruction in the road, necessary to be traveled with trucks whereby they were prevented from reaching the sidetrack on which the freight was spotted according to agreement, whilst the language of the schedule exempting the consignee from liability for demurrage requires that the conditions must be such as to render it *"impossible* during the prescribed free time to get to the cars for loading or unloading." (Our emphasis.) It appears in both Paragraph 1 of Section A of Rule 8 and Paragraph 4 of the same section and rule.

But it is argued that the regulation contained in the filed schedule with the Railroad Commission, and its approval thereof became a declaration of public policy with reference to tariff and demurrage charges which prevented the parties from entering into any sort of contract dispensing with the requirements of the schedule or to become estopped to do so. We agree with that contention, but the public policy so declared is not for the benefit of a consignor or consignee but for the public at large in order to prevent any sort of discrimination in favor of particular consignors or consignees in evasion of the schedule regulations. Therefore, the argument by appellee's counsel to the effect that the carrier in this case (appellant) is estopped to insist that the freight in this case could have been unloaded from the car onto the ground—and later hauled away when conditions changed—because it permitted defendants to install a particular unloading method requiring the presence at the place of unloading of trucks into which the freight might be loaded. If such an estoppel should prevail it could amount to no more than an agreement between the parties that the method employed for unloading was the *only* one to be considered in determining the liability for demurrage, but which would be an evasion of the *requirement* for such nonliability in the very paragraph of the schedule upon which the only defense made is bottomed. Moreover, there is nothing contained in the stipulation to show that the carrier (appellant) obligated itself that the unloading method adopted by defendants should be the *only* one to be employed in unloading the freight since it, according to the stipulation, merely consented thereto.

Tariff schedules and demurrage charges required to be filed by carriers with State and Federal agencies are, as we have seen, founded in public policy and to be enforced in strict accordance with the schedule provisions. Hence no deviation therefrom by contract, estoppel or otherwise will be allowed or upheld. A great number of domestic and foreign cases have so held, and we have found no case, nor has any been cited to us in which a contrary holding was made. An illustrative Kentucky case is, Tobacco By-products & Chemical Corp. v. Western Dark Fired Tobacco Growers Ass'n, 280 Ky. 469, 133 S. W. 2d 723. Other decisions of this court to the same effect are cited in that opinion, but which we deem it unnecessary to catalogue. Among many federal cases approving and announcing the same principle is, Pennsylvania Railroad Co. v. Kittaning Iron & Steel Mfg. Co., 253 U. S. 319, 40 S. Ct. 532, 533, 64 L. Ed. 928, wherein Justice Brandeis in writing the opinion said:

"The aim of the Code (schedule) was to prescribe rules, to be applied uniformly throughout the country, by which it might be determined what detention is to be deemed reasonable. In fixing the free time the framers of the Code adopted an external standard; that is, they refused to allow the circumstances of the particular shipper to be considered. * * * (Our parenthesis.)

"Among the reasons urged for rejecting consideration of the needs or merits of the individual shipper, was the fear that, under the guise of exempting shippers from demurrage charges because of conditions peculiar to them, unjust discrimination and rebates to favored shippers might result."

Also in the case of Turner, etc., Co. v. Chicago, M. & St. P. R. Co., 271 U. S. 259, 46 S. Ct. 530, 531, 70 L. Ed. 934, the same high court employed this language:

"The efficient use of freight cars is an essential of an adequate transportation system. To secure it, broad powers are conferred upon the Commission. Compare United States v. New River Co., 265 U. S. 533, 44 S. Ct. 610, 68 L. Ed. 1165; Avent v. United States, 266 U. S. 127, 45 S. Ct. 34, 69 L. Ed. 202; United States v. P. Koenig Coal Co. (No. 216, April 12, 1926) 270 U. S. 512, 46 S. Ct. 392, 70 L. Ed. 709. One cause of undue detention is lack of promptness in loading at the point of origin,

or in unloading at the point of destination. Another cause is diversion of the car from its primary use as an instrument of transportation by employing it as a place of storage, either at destination or at reconsignment points, for a long period while seeking a market for the goods stored therein. To permit a shipper so to use freight cars is obviously beyond the ordinary duties of a carrier. The right to assess charges for undue detention existed at common law. Now, they are subject, like other freight charges, to regulation by the Commission. Demurrage charges are thus published as a part of the tariffs filed pursuant to the statutes.

"All demurrage charges have a double purpose. One is to secure compensation for the use of the car and of the track which it occupies. The other is to promote car efficiency by providing a deterrent against undue detention."

We have found no case from any court approving a different interpretation.

The same doctrine is set forth in "The Law and Theory of Railway Demurrage Charges," pages 78 and 79 by Professor Hartman, wherein the text says: .

"To entitle a shipper or consignee to relief under Section A-1 of the demurrage rules, it is not sufficient to show inclement weather, i.e., rain, sleet or snow. There must be actual interference with loading or unloading caused directly by the weather conditions. Furthermore, the interference must be with the taking of the goods from the car. Conditions caused by weather, such as bad roads, etc., away from the carrier's right of way do not constitute 'weather interference' within the meaning of the rule."

Learned counsel of appellant in stating his interpretation of Paragraph 4, Section A of Rule 8 (which, as we have seen, contains the only defense relied on), says:

"Obviously recognizing that 'high water' as used in Paragraph 1 is, for the foregoing reasons, unavailing as an excuse, the appellees by pleading and argument have invoked the provisions of Paragraph 4 of Section A, which is not limited by the footnote above referred to. This paragraph excuses delays in unloading when caused

by 'floods, earthquakes, hurricanes or tornadoes, and conditions in the devastated area resulting therefrom.' But there is nothing in the agreed statement of facts which makes the term 'flood' as used in Paragraph 4, rather than 'high water,' as used in Paragraph 1, controlling herein. As used the words 'high water' and 'flood' are not synonymous. By its association with the words 'earthquakes,' 'hurricanes,' 'tornadoes,' and 'devastated area,' it is obvious that by 'flood' is meant something of cataclysmic or catastrophic proportions under the familiar rule of construction expressed in the maxim 'ejusdem generis.' "

In the light of the foregoing authorities, we are forced to the conclusion that counsel's inserted interpretation is correct and that the court erred in adopting a contrary one. It is agreed in the stipulation of the parties that if demurrage is recoverable at all the amount sought in the petition is correct.

Wherefore, for the reasons stated, the judgment is reversed with directions to set it aside and to render one in favor of plaintiff (appellant) for the calculated demurrage due for the months of June and July, 1938, with interest thereon from the date when payment thereof was demanded.

The whole Court sitting.