UNION MECHLING et al., Plaintiffs,

v.

The **UNITED STATES** of America and the Interstate Commerce Commission, Defendants,

and

Hennepin Towing Company, Intervening Defendant.

Civ. A. No. 73–1063.

United States District Court,
W. D. Pennsylvania.

Nov. 26, 1974.

Richard L. Thornburgh, U. S. Atty., Pittsburgh, Pa., John H. D. Wigger, Dept. of Justice, Washington, D. C., for U. S.

H. G. Homme, Jr., Washington, D. C., for I. C. C.

G. Daniel Carney, Thorp, Reed & Armstrong, Pittsburgh, Pa., for plaintiffs.

Donald Macleay, Macleay, Lynch, Bernhard & Gregg, Washington, D. C., S. S. Eisen, Eisen & Mitchell, New York City, for Union Mechling Corp.

Richard J. Hardy, Hardy & Chapman, Washington, D. C., for Federal Barge Lines, Inc. and Gulf-Canal Lines, Inc.

Harry C. Ames, Jr., Ames, Hill & Ames, P. C., Washington, D. C., for American Commercial Barge Line Co., Coyle Lines Inc. and The Valley Line Co.

William F. King, Major, Sage & King, Alexandria, Va., Eric P. Reif, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for Hennepin Towing Co.

Before WEIS, Circuit Judge, and DUMBAULD and SCALERA, District Judges.

## OPINION

SCALERA, District Judge.

This is an action to enjoin the order of the Interstate Commerce Commission (I.C.C.) [1] granting a certificate of public convenience and necessity to Hennepin Towing Company (Hennepin), the intervening defendant, to operate as a common carrier by· water on certain inland waterways—on the Mississippi River from St. Paul-Minneapolis to New Orleans; on the Illinois River from Chi-

---

1. Docket No. W–356 (Sub. No. 12), Hennepin Towing Company, Extension–Upper Mississippi River, reported at 343 I.C.C. 422

(Issued April 27, 1973 and served May 8, 1973.)

cago to its confluence with the Mississippi; and on the Ohio River, including the Allegheny and Monongahela Rivers.[2] The authority of Hennepin prior to the issuance of the certificate included authority on the Arkansas-Verdigris Waterway, and restricted authority to operate from or to points on the Arkansas-Verdigris Waterway, on the one hand, and the Mississippi River, from Minneapolis to New Orleans, and the Illinois Waterway, on the other hand.[3][4]

2. The specific operating authority sought and granted is set out in the Commission decision as:
 " . . . operation, in interstate or foreign commerce, as a common carrier by water, by non-self-propelled vessels with use of separate towing vessels, in the transportation of commodities generally, and by towing vessels in the performance of general towage, between ports and points along the Mississippi River below and including Minneapolis, Minn.; the Minnesota River below and including Stillwater, Minn.; the Illinois Waterway below and including the Lake Michigan ports between and including Waukegan, Ill., and Michigan City, Ind.; the Ohio River below and including Pittsburgh, Pa.; the Allegheny River below and including East Brady, Pa.; the Monongahela River below and including Fairmont, W. Va.; the Kanawha River below and including Ganley Bridge, W. Va.; and the Licking River below and including Ryland Lakes, Ky." 343 I.C.C. at 423.

3. Specifically, the operating authority of Hennepin prior to the grant in question consisted of:
 "(1) by towing vessels in the performance of general towage, and by non-self-propelled vessels with the use of separate towing vessels in the transportation of contractors' machinery and equipment, between ports and points along the Mississippi River below and including Cairo, Ill., and tributary waterways in Arkansas and Louisiana (including the Pearl and West Pearl Rivers below and including Bogulusa, La., and including ports and points on the Port Allen section of the Gulf Intracoastal Waterway from Indian Village, La. to Port Allen, La.); and the Mississippi River–Gulf Outlet Channel, and (2) by non-self-propelled vessels with the use of separate towing vessels in the transportation of lubricating oils and greases, in packages in lots of less than 300 tons, from Chaison (Beaumont), Tex., to Baton

---

## I

### History of the Case

On February 1, 1971, Hennepin filed an application for a certificate of public convenience and necessity authorizing it to extend its water carrier operations. Seven barge lines (including the plaintiffs)[5] and nine railroads[6] protested Hennepin's application. The application was supported by over a dozen shippers, various port authorities (St. Paul

Rouge, La., and (3) by non-self-propelled vessels with the use of separate towing vessels in the transportation of general commodities, and by towing vessels in the transportation of general towage (a) between points along the Arkansas-Verdigris Waterway, and (b) between points on such waterway, on the one hand, and, on the other, points along the Mississippi River below and including Minneapolis, Minn., the Minnesota River below and including Shakopee, Minn., the St. Croix River below and including Stillwater, Minn., the Illinois Waterway and connecting canals and waterways including canals and waterways serving Chicago, Ill., and Whiting, East Chicago, Gary and Michigan City, Ind., and the Mississippi River–Gulf Outlet Channel, restricted to traffic which insofar as movement by water carrier is concerned originates at or is destined to points on the Arkansas-Verdigris Waterway." 343 I.C.C. at 423–424.

For clarification, it should be noted that where service consists of general towing, the barge is provided by the shipper, while in affreightment service the barge as well as the motive power are provided by the carrier. The majority of the service which will be at issue in this opinion generally pertains to affreightment service.

4. This court has jurisdiction under 28 U.S.C. §§ 1336, 2284, 2321–2325. Venue exists under 28 U.S.C. § 1398, since plaintiff Union Mechling Corporation maintains its principal office in Pittsburgh.

5. There were seven barge lines who protested Hennepin's application, two of the lines, Union Barge Lines and A. L. Mechling, have since merged; while Coyle Lines is a wholly-owned subsidiary of American Commercial Barge Lines and there is presently pending a request before the I.C.C. for the merger of Coyle into American Commercial.

6. The protesting railroad lines are not parties in this case.

and New Orleans), and an expert witness who testified that it was in the public interest for the I.C.C. to grant the application.

Following the filing of Hennepin's application, public hearings were held in Chicago, Illinois and Washington, D.C., for a period of over ten days during the summer of 1971.

On June 8, 1972, the Hearing Examiner (now Administrative Law Judge) in his report recommended that the application be denied for two reasons: (1) that Hennepin had failed to establish that it was fit and able to provide the proposed service; and (2) Hennepin had not shown that it was a matter of public convenience and necessity to grant the proposed authority because Hennepin, although it had convincingly showed that substantial increases in future growth of regulated as well as unregulated traffic on the inland waterways would occur, had not demonstrated that the existing carriers will not meet the challenge of these increases or that additional carrier(s) will be needed to satisfy this projected growth.

Hennepin filed exceptions to the Administrative Law Judge's report and recommendation, and plaintiffs filed responses to the exceptions supporting the decision reached by the Administrative Law Judge.

Division One of the I.C.C. reversed the Administrative Law Judge's decision in its report decided April 27, 1973 and served May 8, 1973. The Commission concluded:

". . . a public need has been demonstrated for the proposed service, and that the application should be granted . . ." 343 I.C.C. at 428.

and further that the applicant has

". . . shown itself to be fit and able to provide the proposed service." (Ed. at 430.)

Although the Commission's decision reversed that of the Administrative Law Judge, 343 I.C.C. at 423, the I.C.C. found "the Administrative Law Judge's statement of the facts to be substantially correct in all material respects," and adopted that statement. The Commission adopted the summary by the Administrative Law Judge of the evidence of the supporting witnesses and protesting carriers by including it as an appendix to its decision. (343 I.C.C. at 432–452.)

The decision of the Commission is based on the following factors:

(1) "The likelihood that traffic on the upper Mississippi River and its tributaries will increase substantially in the foreseeable future . . . and there will be a corresponding requirement for substantial expansion of water carrier facilities in order to meet these increased demands for water carrier service" and "to meet these increased demands . . . applicant should be authorized to operate at maximum efficiency." 343 I.C.C. at 428–429.

(2) "Contrary to the determination of the Administrative Law Judge, the evidence presented by shippers of bulk commodities . . . is entitled to consideration," because (1) when more than three distinct bulk commodities are hauled in a single tow the strictures of section 303(b) (the then-applicable Three-Commodity Rule) would transform unregulated traffic to regulated traffic and (2) such evidence relating to the shipment of bulk commodities, although not regulated by the Commission generally, is an important factor for the Commission to consider "in obtaining a more complete picture of the actual transportation scene, which must necessarily include some consideration of the impact on equipment, storage, and the present and future operation of regulated carriers due to the significant tonnages now moving in exempt carriage." 343 I.C.C. at 429.

(3) That contrary to the Administrative Law Judge's determination, Hennepin, a wholly-owned subsidiary of the Upper Mississippi Towing Company, has shown itself to be fit and able to perform the proposed service through the

pooling of equipment and joint efforts with its parent company. (Id. at 430.)

The Commission summarily decided that its grant to Hennepin was not a "major Federal action[s] significantly affecting the quality of the human environment" within the meaning of § 102(2)(C) of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C).

In June and July, 1973, petitions for reconsideration were filed by the plaintiffs, and these petitions were responded to by the applicant, Hennepin. On November 4, 1973, Division One served its order denying the protesting carriers' petitions for reconsideration and outlining in greater detail the Commission's reasoning in reaching its decision that the grant to Hennepin did not require a NEPA statement. Thereafter the entire Commission denied plaintiffs' petition for a finding that this proceeding involves issues of general transportation importance. The Commission therefore held that review before the entire Commission was not warranted.

The plaintiffs filed their complaint with this court on December 11, 1973.

On December 18, 1973, Hennepin's motion to intervene as a defendant was granted, and then, on December 27, 1973, plaintiffs jointly filed a motion to consolidate this action, Civil Action No. 73–1063, with the SCNO proceeding, Civil Action No. 73–956. While intervening defendant Sioux City in Civil Action No. 73–956 opposed consolidation, Hennepin filed a brief on January 22, 1974, supporting the motion to consolidate.

This court denied the motion to consolidate on February 14, 1973, and established a briefing schedule. Oral argument before the three-judge statutory court was held.

## II

### Scope of Review

Judge Aldisert in Leonard Express, Inc. v. United States, 298 F.Supp. 556, 559 (W.D.Pa.1969) stated:

"There have been various judicial expressions of the precise scope of this review. We are impressed by the standard set forth in Illinois Central R. Co. v. United States, 263 F.Supp. 421, 430 (D.C.Ill.1966), aff'd 385 U.S. 457, 87 S.Ct. 612, 17 L.Ed.2d 509:

'The function of this court in reviewing this determination of the Commission is sharply restricted. "It is limited to ascertaining whether there is warrant in the law and the facts for what the Commission has done." United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 536, 66 S.Ct. 687, 698, 90 L.Ed. 821 (1946); 5 U.S.C. § 1009(e). "The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286–287, 54 S.Ct. 692, 694, 78 L.Ed. 1260 (1934). Once this court finds substantial evidence in support of the Commission's findings, it cannot go further and inquire into the soundness of the Commission's reasoning or the wisdom of the result. Virginian Ry. v. United States, 272 U.S. 658, 663, 47 S.Ct. 222, 71 L.Ed. 463 (1926); United States v. New River Co., 265 U.S. 533, 542, 44 S.Ct. 610, 68 L.Ed. 1165 (1924).'"

■■ "Substantial evidence" in the sense it is used in the Administrative Procedure Act, 5 U.S.C. § 706(2)(E), has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126. "[I]t must be enough to justify, if the trial went to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660. This is something less

than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. Consolo v. Federal Maritime Commission, 383 U.S. 607, 619–620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966). Although the Commission in Hennepin essentially adopted the Administrative Law Judge's statement of facts, the Commission is not bound by the Law Judge's decision; on the contrary, the *Commission* is required to reach its own conclusions based upon the evidence. Section 8 of the Administrative Procedure Act (APA), 5 U.S.C. § 557, and Morgan Drive-Away, Inc. v. United States, 268 F.Supp. 886 (N.D.Ind.1967). To put it another way, the mere fact that the Commission adopts the Administrative Law Judge's findings of fact does not impose upon the Commission the added burden of explaining how it arrived at contrary conclusions because the APA does not relegate the Commission to the role of a reviewing court; rather, the APA confers on the Commission the right to make its own conclusions from the evidence.

### III

*Substantial Evidence to Support the Commission's Conclusion that Hennepin is "Fit, Willing and Able" to Provide the Proposed Service?*

The Commission found that the "applicant will be able to carry on the proposed service." 343 I.C.C. at 430. The Administrative Law Judge's report concluded that Hennepin was not fit and able to perform the proposed service because Hennepin relies on its parent company, UMTC, for the vast majority of its barges and power equipment, and because UMTC is not bound to continue to supply Hennepin. The Administrative Law Judge reasoned that because the applicant could not assure that at some future date UMTC's cooperation would not be withdrawn, the applicant could not guarantee performance.

Division One reached a contrary conclusion by noting that Hennepin itself owned enough equipment outright to perform the proposed service. The Division pointed out that much of the equipment which Hennepin charters from UMTC is under an irrevocable agreement and that the dissolution of the UMTC—Hennepin arrangement was an extremely remote possibility.

Protestants' contention on the fitness of Hennepin is not directed to the possibility that UMTC would withdraw its support to Hennepin. The plaintiffs contend instead that because Hennepin individually owns a limited number of barges and equipment, the applicant will enjoy a competitive advantage in regulated traffic over the protesting carriers which would enable Hennepin "to skim the most lucrative traffic from carriers such as plaintiffs." (Tr. at p. 56.) The contention is based on the following reasoning; as a regulated carrier, Hennepin would be obligated to provide regulated service only to the extent of its limited individual ownership of barges and equipment. Hennepin could use its limited individual ownership of equipment to a profit advantage over the protesting carriers who own their equipment because Hennepin could refuse to provide service when tendered less profitable regulated traffic by explaining that all of its very limited equipment was tied up on the movement of (more profitable) exempt traffic. On the other hand, when Hennepin was tendered more lucrative regulated traffic, it would book the commodity despite the fact its own individual equipment was involved in exempt traffic by using the equipment pool of its parent, UMTC. In this manner, plaintiffs assert, Hennepin could skim the most lucrative regulated traffic while it rejects less profitable regulated traffic, and thereby frustrate its obligations as a certificated carrier.

Plaintiff Union Mechling raised the identical contention before Division One in its petition for reconsideration filed June 21, 1973. Division One, acting as an appellate body, rejected this conten-

tion when it denied the above petition. Plaintiffs' contention is unpersuasive and therefore must be again denied as a basis to annul or set aside the Division's report. The real root of the alleged ability of Hennepin to skim lucrative traffic from plaintiffs originates, according to the protestants, in the fact that Hennepin owns individually a limited amount of equipment. The flaw in this contention is its lack of an objective and factual basis. Since the assertion by its very nature offers a conjecture as to the future conduct of applicant Hennepin, there can obviously be no factual basis in the record for the proposition that Hennepin will skimp its common carrier obligations in the handling of regulated traffic. Plaintiffs have referred to no case that supports their contention.

The plaintiffs' position cannot be understood as an indictment of all parent-subsidiary equipment pooling and chartering arrangements in the field of certificated water carriers, because such a proposition would militate against protestant American Commercial Barge Lines (ACBL). ACBL does not own a single barge or towboat; it relies completely on its parent company, American Commercial Lines, for its barges and power equipment. (Ex. 44, p. 2, App. D and E.) Without pursuing an extensive factual analysis, it would appear that ACBL's arrangement with American Commercial subjects them to the precise argument which protestants have raised against Hennepin.

■ The court's inquiry upon this review is not to substitute what we or protestants believe is the proper manner in which to assess the relative merits of the corporate parent-subsidiary arrangement as it relates to fitness and ability to serve as a certificated carrier pursuant to 49 U.S.C. § 909(c). The court is empowered to search the record to determine whether the conclusion of the Commission is arbitrary, capricious, or based upon substantial evidence. Exercising this limited review, we believe that the Commission's detailed explanation of the number and type of barges owned or chartered by Hennepin (343 I.C.C. 424–425) provides a reasoned and substantial basis upon which to support Division One's conclusion that the applicant was fit, willing and able to perform the proposed operation. The plaintiffs' contention is without merit.

### IV

*Substantial Evidence to Support Division's Conclusion that Future Growth of Traffic on the Upper Mississippi Warrants Granting the Application?*

The basis of Division One's decision is embodied in the following conclusion:

"We are of the opinion that a public need has been demonstrated for the proposed service, and that the application should be granted. While it appears that protestants presently are able to render a generally adequate service in the transportation of regulated traffic in the involved area, it is our considered judgment that a grant of authority is warranted in view of the likelihood that traffic on the upper Mississippi River and its tributaries will increase substantially in the foreseeable future. . . . In this case, it appears that, due to increases in population and industry in the area surrounding the upper Mississippi River and its tributaries . . . there will be a continuing and substantial increase in both regulated and exempt traffic moving between points in the involved area; and there will be a corresponding requirement for a substantial expansion of water carrier facilities in order to meet increased demands for water carrier service. In order to meet these increased demands, we believe that applicant should be authorized to operate at maximum efficiency." 343 I.C.C. 428–429.

Plaintiffs contend that, from the record in this proceeding, the Commission (Division One) could not rationally con-

clude that there was any substantial evidence demonstrated to justify granting the proposed authority as it relates to the upper Mississippi River specifically, and to the Ohio, Illinois, and lower Mississippi Rivers in general. The plaintiffs describe the record insofar as it pertains to supporting testimony of shippers and/or receivers on the upper Mississippi as "sketchy." Although the protesting carriers in their brief (p. 15) recognize that there exists "some support for predicted increases" in waterborne commerce to and from the upper Mississippi, they argue that such evidence is insufficient because it is derived from the statistics of the Corps of Engineers and not from the testimony of shippers or receivers operating on the upper Mississippi and the other rivers.

The support for the Division's conclusion about the growth of waterborne traffic on the upper Mississippi is documented in the record: (1) the Administrative Law Judge in his report and recommendation agreed that the applicant had "convincingly demonstrated that there will be rather substantial increases in future growth of regulated as well as unregulated traffic" (p. 42 of the Administrative Law Judge's report); (2) the spokesman for the Port Authority of the City of St. Paul (343 I.C.C 445; Administrative Law Judge's statement of the facts are set out in full as an appendix to the Commission's decision) testified that the very comprehensive studies of the Corps of Engineers showed that substantial increases in waterborne tonnage would occur on the upper Mississippi River Basin; (3) the spokesman for the Board of Commissioners of the Port of New Orleans (343 I.C.C 446), in a more specific analysis of the generally projected increases in domestic water traffic, stated that "general cargo barge traffic" (consisting only of non-bulk, regulated traffic which cannot move as exempt traffic) will increase substan-

tially at New Orleans by 1974; [7] (4) Dr. Nightingale, an expert witness, stated that tonnage on the Mississippi River System will increase by about ⅔ (64%) in the next eleven years. (343 I.C.C. 447.)

The conclusions of the Commission must stand if they are supported by substantial evidence. Reviewing the testimony, it can hardly be said that the finding that substantial increases of water tonnage would occur on the upper Mississippi is unsupported by substantial evidence.

Some shippers were satisfied with the existing service. The summary of the testimony of F. S. Services, Inc. (343 I.C.C. 433) indicates that existing carriers are capable of handling its regulated (wire and twine) traffic from New Orleans. Evans Products Company and Inter-State Steel Company felt that their present barge service was satisfactory and that they needed no additional barge service. (Id. at 432, 439.)

On the other hand, the Administrative Law Judge's summary of the facts indicates that Keystone Consolidated Industries, Airco Co., and First Mississippi Corp. support the Commission's decision as it related to regulated traffic on the upper Mississippi.

Keystone, a steel fabricator, moves iron and steel scrap inbound to its Peoria (Illinois Waterway) plant. The scrap traffic can originate at any point along the Mississippi, the Illinois, or Ohio Rivers, or their tributaries. One of the representative points of scrap origin was Davenport, Iowa, located on the upper Mississippi. Keystone's witness pointed out that barge service is cheaper so it is utilized to the fullest extent in its scrap shipments. Keystone complained that existing barge service has been unsatisfactory because barges have been unavailable during the peak grain (harvest) seasons and at times the

7. This testimony is relevant to the question of growth in regulated traffic on the upper Mississippi because undoubtedly some portion of the general cargo barge traffic increase at New Orleans will correspond to an increase in barge traffic to or from the upper Mississippi River Basin.

barges that were available were leaking or equipped with bad covers. (343 I.C. C. 435–437.)

First Mississippi Corporation, a chemical manufacturer, has potential, though not yet secured, customers for its bagged urea (regulated commodity) in Missouri and in Clinton, Iowa, which is located on the upper Mississippi. (Id. at 438.) Airco Alloy and Carbide, division of Air Reduction Company, Inc. (Airco) moves scrap steel inbound to its Kentucky plant (located on the Tennessee River sixteen miles from the Ohio River) from the upper Mississippi port of Davenport, Iowa. Airco has used the services of applicant's parent, UMTC, for shipment of bulk traffic. Airco, until mid-1970, had received satisfactory barge service. However, lately it has been experiencing difficulty in obtaining prompt barge service from the majority of the protesting carriers, especially during the peak harvest season (November–December). (Id. at 443.) Airco testified that it would use the services of Hennepin, if the proposed application were approved, to move ferro alloys and scrap steel and pig iron. (Id. at 444.)

[4] The testimony is not an uninterrupted and uniform condemnation of the existing service provided by the plaintiffs. The substantial evidence test does not require that such be established. Contrary to plaintiffs' assertions, the statistics of the Corps of Engineers do not stand in isolation. The testimony of at least three shippers establishes the need for regulated barge service on the upper Mississippi. As often noted, the Commission possesses a "wide range of discretionary authority" in determining whether the public interest warrants certification of the proposed authority. United States v. Detroit & Cleveland Nav. Co., 326 U.S. 236, 241, 66 S.Ct. 75, 90 L.Ed. 38 (1945); Interstate Commerce Comm. v. Parker, 326 U.S. 60, 65 S.Ct. 1490, 89 L.Ed. 2051. The evidence on the growth of regulated traffic is adequate to justify the Commission's issuance of the certificate.

V

*Substantial Evidence to Justify the Grant as it Relates to Lower Mississippi and Other Areas?*

The certificates which the Commission approved enables Hennepin to operate as a regulated water carrier on the Mississippi, the Illinois, and the Ohio. Plaintiffs alternatively advance the contention that, even if it be assumed that there exists substantial evidence to grant Hennepin authority on the upper Mississippi, there is still no reason for the Division to have issued such a broad certificate to Hennepin.

Plaintiffs' contention ignores the evidence which is contained in the Administrative Law Judge's summary of facts. Airco, which expects to use Hennepin's newly-certificated authority, would be shipping regulated steel and steel alloys from its Kentucky plant to Chicago, East Liverpool, Ohio, and Pittsburgh. In order to accommodate Airco, Hennepin would pick up the barges at the point where the Tennessee flows into the Ohio from one of the Tennessee River feeder lines. Hennepin would then use the Ohio north to East Liverpool, Ohio, and Pittsburgh; in order to go to Chicago, the route would of course be the Ohio River south to the Mississippi, then north on the Mississippi to the Illinois and on into Chicago. (343 I.C.C. 443–444.)

The testimony of Northwestern Barrel Company, which has been unsatisfied with plaintiff ACBL's service because of leaky barges, indicates that the company would tender to Hennepin its regulated business from Chicago to New Orleans because the applicant had satisfactorily supplied liquid barges to this company in the past. Again, Hennepin would need regulated authority on the Illinois and Mississippi to provide Northwestern this barge service. (343 I.C.C. 441–442.)

Assuming that First Mississippi Corporation establishes its customers for area in the upper Mississippi and in Cincinnati, Ohio, there exists the likeli-

hood that the applicant could provide that service because of its authority on the Mississippi and Ohio Rivers. (Id. at 439.)

Steel fabricators like Keystone Industries (Id. at 435) and steel importers and processors like Instel Corp. (Id. at 438) and Inter-State Steel Company (Id. at 439) rely on barge service on the Mississippi, Illinois, and Ohio Rivers. Each company has had a particular complaint about the barge service with which they have been provided and all three companies agreed that barge service would be improved if the Hennepin application were granted.

Plaintiffs have criticized much of the testimony because they contend that the Commission relied on the "likelihood" that certain barge service will grow and/or be developed. They argue that the Commission erred in using mere likelihood as the basis for authorizing the proposed service because there is a likelihood of anything and, in that sense, the basis of the grant to Hennepin is based on speculation and not on evidentiary support in the record. That the Commission framed its language in terms of the "likelihood" that barge traffic would increase is not beyond its discretion as arbiter of present and future public convenience. The Supreme Court in United States v. Detroit and Cleveland Navigation Co., supra, 326 U. S. at 241, 66 S.Ct. at 77, explained:

"[I]ts doubt that the public interest will be adequately served if resumption of service is left to existing carriers is entitled to the same respect as its expert judgment on other complicated transportation problems. See Chesapeake & O. R. Co. v. United States, 283 U.S. 35, 42 [51 S.Ct. 337, 339, 75 L.Ed. 824, 829]; Alton R. Co. v. United States, 315 U.S. 15, 23 [62 S.Ct. 432, 437, 86 L.Ed. 586, 595]. Forecasts as to the future are necessary to the decision. But neither uncertainties as to the future nor the inability or failure of existing carriers to show the sufficiency of their plans

to meet future traffic demands need paralyze the Commission into inaction. It may be that the public interest requires that future needs be assured rather than left uncertain. The Commission has the discretion so to decide."

That the function of the Commission in determining the public convenience and necessity includes a consideration of the future, as well as the present public interest, was noted by this court in Pittsburgh & New England Trucking Co. v. United States, 345 F. Supp. 743, 750–751 (W.D.Pa.1972) aff'd sub nom. Ace Doran Hauling & Rigging Co. v. Interstate Commerce Commission, 409 U.S. 1070, 93 S.Ct. 686, 34 L.Ed.2d 660 (1972):

". . . it must be remembered that the task of exercising expert judgment with regard to questions of transportation (including its growth and development) belongs to the Commission rather than the courts."

See also, Lang Transportation Corp. v. United States, 74 F.Supp. 915, 929 (S. D.Cal.Central Div.1948).

The Commission, in this proceeding, merely secured the future needs of the public for barge service. While noting the general adequacy of service performed by existing carriers, the Commission chose to grant authority to Hennepin so that the frequent complaints of shippers over existing service, the barge shortage which exists during the peak grain seasons, and the well-documented future growth of barge service would all be accommodated.

The Commission has the discretion to so decide.

### VI

*Did the Commission Properly Consider the Objectives of the National Transportation Policy When it Considered the Testimony of Shippers of Bulk Commodities?*

The Commission concluded:

"We are of the opinion that, contrary to the determination of the Adminis-

trative Law Judge, the evidence presented by shippers of bulk commodities (which can now move under the bulk exemption together with regulated commodities because of the 'mixing rule') is entitled to consideration. It is true that evidence of this type, standing alone, would be insufficient to demonstrate a need for a grant of authority to transport regulated commodities inasmuch as authority would not be required for their separate transportation and this Commission has consistently refused to grant authority when none is required. Such evidence in the instant proceeding, however, aids this Commission in obtaining a more complete picture of the actual transportation scene on the inland waterways, which must necessarily include some consideration of the impact on equipment, storage, and the present and future operations of regulated carriers due to the significant tonnages now moving in exempt carriage. Furthermore, bulk commodities which could move under the section 303(b) exemption can move as regulated commodities when there are more than three such commodities in a tow; and it appears that, prior to the recent 'mixing rule' amendment, a significant amount of bulk material moved in regulated towage. Applicant intends to move bulk commodities, particularly in circumstances where it might wish to fill out a tow with more than three bulk commodities, which would necessitate

their movement in regulated service. The evidence indicates that a substantial amount of bulk exempt traffic is available for transportation, and that the services of additional carriers are or will be needed in order to transport this traffic. We are of the opinion that applicant should be authorized to combine both regulated and unregulated traffic in the interest of meeting this need for service, and in order to gain the maximum utilization of its barge and towboat fleet."[8] 343 I.C.C. at 428–429.

Plaintiffs criticize the Commission's consideration of the well-documented growth and availability of bulk exempt traffic. They contend that evidence of the large increase in bulk-exempt commodities is pertinent to this case only if the Commission also finds that substantial amounts of bulk-exempt traffic will move in a regulated status. And plaintiffs assert that the testimony of bulk shippers shows that the probability of their exempt commodities moving in a regulated status is extremely remote. (Tr. 575, Tr. 650.) Plaintiffs' assertion, in other words, claims that it is impermissible for the Commission to consider the impact that the volume of bulk-exempt commodities (comprising nearly 95% of the totality of tonnage on the inland waterways) has on the availability of equipment for regulated commodities.

■ It is undisputed that a very small percentage of the inland water

---

8. The reference by the Commission requires some explanation of the chronological progression of the various amendments that have altered the meaning and effect of § 303(b) of the Act. (49 U.S.C. § 903(b).) When Part III of the Act, 49 U.S.C. § 901 et seq., was enacted in 1940, it included the three-bulk-cargo exemption of § 303(b), i. e., that bulk traffic could be moved without certification from the Commission as long as no more than three different bulk commodities were carried in a single tow. Shortly thereafter, the Commission's staff ruled that a bulk-exempt cargo lost its exemption if it were mixed (included) with non-bulk commodities. Administration Ruling No. 6,

CCH Fed.Carr.Rep. ¶ 25406 (March 20, 1941). See also Gulf Canal Lines, Inc. v. United States, 258 F.Supp. 864 (S.D.Tex. 1966). The Commission consistently stuck to this view until 1970, when § 303(b) was amended by P.L. 91–590 to permit mixing of bulk and non-bulk commodities without the loss of the exemption to the bulk commodities. The Three-Commodity Rule of § 303(b) was abolished by P.L. 93–201 in December of 1973. Therefore, at the time, the Commission rendered this decision in question, the Three-Commodity Rule was still in effect. Presently, any number of different bulk commodities may be assembled in a single tow without the loss of the exemption.

traffic is subject to the Commission's regulation. It is also clear that Congress has seen fit to twice amend § 303(b) of the Act to allow for greater flexibility and efficiency in the assemblage of mixed tows while still permitting bulk cargo to maintain its exempt status. Such action suggests that bulk commodities have an impact on the availability of barges for regulated traffic and on barge transportation in general. If, for example, a carrier's barges are in use most of the time in bulk activity over which the Commission has no direct regulation, it seems unrealistic to suggest that the Commission ignore bulk traffic in determining the public's interest in regulated traffic. To adopt the assertion of the plaintiffs would be to prevent the Commission from exercising the expert transportation judgment with which it has been entrusted. United States v. Detroit & Cleveland Navigation Co., supra, 326 U.S. at 241, 66 S.Ct. 75. It was proper for the Commission to consider the testimony of the bulk shippers.

As an additional argument, plaintiffs advance the proposition that this decision by the Commission is not consistent with the National Transportation Policy. 49 U.S.C. preceding §§ 1, 301, 901, and 1001.[9] Plaintiffs contend that this grant is a radical departure from prior policy and is tantamount to the Commission's adoption of a free-entry policy. Plaintiffs reason that all that anyone of the several hundred exempt carriers need do to receive operating rights is to suggest, as Hennepin has done, that a

particular operating authority should be granted by the Commission in order to permit the exempt carrier to operate at greater economy and efficiency by carrying regulated traffic along with their numerous non-regulated tows. (Br., p. 50.) And such a policy, plaintiffs conclude, would not encourage sound transportation as the National Transportation Policy requires, because it would discourage the present regulated carriers from making the necessary investments in their equipment to provide the best service possible to regulated shippers.

■ The theory advanced by the plaintiffs has for its basis the proposition that the failure by the applicant Hennepin to show inadequacy of existing service must of necessity cause the application to be denied. As noted, a showing of inadequacy of existing service is not the *sine qua non* for the granting of additional authority. The National Transportation Policy requires the Commission to grant certificates of public convenience and necessity to "promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers." As noted, the Supreme Court has explained that this policy is the "yardstick by which the correctness of the Commission's actions will be measured." Schaffer Transportation Co. v. United States, 355 U.S. 83, 88, 78 S.Ct. 173, 176, 2 L.Ed.2d 117 (1957). Contrary to plaintiffs' contentions, the ability to improve efficien-

9. " 'National Transportation Policy': 'It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act [chapters 1, 8, 12, 13 and 19 of this title], so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue prefer-

ences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy.' "

cy and economy is one of the goals that the policy encompasses.

As to whether any of the other bulk carriers would be able to use this decision as a precedent to enable them to obtain operating certificates for regulated traffic calls for speculation by this court. Whether the Commission would grant future water carrier certificates is a matter that must be handled on a case by case analysis.

Of course, the efficiency which Hennepin could derive from the authority was not the major justification for the decision of the I.C.C. A projected increase in traffic on the upper Mississippi is the key finding. The Commission's conclusions as to efficiency supplemented this finding.

 The decision is not inconsistent with the National Transportation Policy.

## VII

*Does the Record Support the Commission's Reliance on the Nashua Case?*

Plaintiffs dispute the Commission's reliance on Nashua Motor Express, Inc. v. United States, 230 F.Supp. 646 (D.N. H.1964). The Commission in its report stated:

"Inadequacy of present service is not a prerequisite to a finding that the public convenience and necessity requires a grant of authority. Rather, it is only one factor to be considered in arriving at the broader determination of that question. Other elements include the desirability of competition and the desirability of improved service. Nashua Motor Express, Inc. v. United States, 230 F.Supp. 646 (1964). The word 'necessity' must not be taken too literally as requiring a transportation crisis of major proportions before an application is granted. If this were the meaning, the word 'convenience' would be superfluous. Norfolk Southern Bus Corp. v. United States, 96 F.Supp. 756, 761, affirmed 340 U.S. 802 [71 S.Ct. 68, 95 L.Ed. 590] (1940)." 343 I.C.C. at 428–429.

The plaintiffs contend that the *Nashua* case is inapplicable to the factual context presented in this record. While plaintiffs seem to recognize the reasoning of *Nashua*, they assert that an applicant is relieved of the requirement of showing the inadequacy of existing service only "in certain unusual cases" or where "extraordinary circumstances" exist.[10]

10. Plaintiffs refer to the following language in Drum Transport, Inc. v. United States, 298 F.Supp. 667, 669, 672 (S.D.Ill.1969), which that court used in reversing the grant of new authority:

" . . . we believe the grant of a new certificate requires a finding, upon sufficient evidence, that existing service is inadequate. No such evidence or finding appears in the record before this court.

\* \* \* \* \*

"The certificate authorizes duplicating, competitive service, and it cannot stand without a finding that presently existing service is inadequate. No such finding was made and the record before us . . . does not set forth facts which would support such a finding."

The above language does not cast doubt on the reasoning of the *Nashua* case. In *Drum*, the court felt that no new or improved service would be authorized by the Commission's decision because the Commission's decision had omitted a restriction which the applicant had requested and which restriction would have provided a new and

distinctly different service than that offered by the protestants. Because of the omitted restriction, the court felt that there was no guarantee that the proposed service would not merely duplicate the existing service and therefore applied the rule that inadequacy of existing service should be proven in order to authorize the unrestricted grant.

In Mobile Homes Express Ltd. v. United States, 354 F.Supp. 701, 708 (W.D.Okl. 1973), plaintiffs refer to the following passage:

"The Commission has applied the rule that an unused existing carrier should be afforded the opportunity to handle all the traffic it can transport adequately and efficiently before new competing service is authorized. Curtis, Inc. v. United States, 225 F.Supp. 894 (D.Colo.) aff'd, 378 U.S. 128, 84 S.Ct. 1658, 12 L.Ed.2d 744."

This case is not persuasive because, as the passage itself indicates, there was an unused existing carrier, while in Hennepin the grant is premised upon the finding that all the existing carriers, while adequately handling the

(Br., p. 52) Specifically, plaintiffs aver that because Hennepin has not shown that the service it proposes will be in any way different from or an improvement over that service provided by existing carriers, the Commission's reliance on *Nashua* is misplaced. Plaintiffs also advance the proposition that the *Nashua* reasoning has no application where, as here, the applicant is attempting to become a new entrant in the field of regulated water carrier on the Mississippi River System.

■ We agree with plaintiffs that the adequacy of existing service is one of the considerations which the Commission must consider. However, adequacy of existing service is not a controlling factor; rather, it is one of several elements that are to be considered. Yellow Forwarding Company v. I.C.C., 369 F. Supp. 1040, 1046 (D.Kan.1973).

In *Nashua,* supra, 230 F.Supp. at 652, the court explained that besides the adequacy of existing service, "other elements of importance appear to be the desirability of competition, the desirability of different kinds of service, and the desirability of improved service." *Nashua* outlines the factors to be weighed by the Commission in determining where the public interest lies. And in determining this, the Commission is required to consider the "total situation." United States v. Detroit & Cleveland Navigation Co., supra, 326 U.S. at 241, 66 S.Ct. 75.

Plaintiffs' arguments unduly restrict the application of the *Nashua* case. Cases prior to *Nashua* have reached the similar conclusion that a specific showing of inadequacy of existing service is not required. Lang Transportation Corp. v. United States, supra, 75 F. Supp. at 930–931; Sloan's Moving & Storage Co. v. United States, 208 F. Supp. 567, 570 (E.D.Mo.1962) aff'd 374 U.S. 95, 83 S.Ct. 1687, 10 L.Ed.2d 1026 (1963). A uniform line of cases has relied on the reasoning of *Nashua* to explain the weight which adequacy of existing service should receive. Denver & Rio Grande Western R. Co. v. United States, 312 F.Supp. 329, 333 (D.Colo. 1970) [rejecting the contention that no certificate should issue unless an "urgent necessity" were shown]; Feature Film Service, Inc. v. United States, 349 F.Supp. 191, 201 (S.D.Ind.1972) [inadequacy of service is one of many factors to consider]; Slay Transportation Co., Inc. v. United States, 353 F.Supp. 555, 560 (E.D.Mo.1973) [finding of inadequacy of existing service not a condition precedent to a grant of additional authority where other factors are present]; Yellow Forwarding Co. v. I. C.C., supra, 369 F.Supp. at 1046 [adequacy of existing service not a controlling factor, but one of several elements]. These cases leave little doubt about the continuing vitality of *Nashua's* reasoning.

The major question here is whether the record evidences a desire for improved service which would justify *Nashua's* application. As the Commission stated, the existing service has been "generally adequate." 343 I.C.C. at 428. Therefore, the desire for improved service is the basis for the Commission's reliance on *Nashua.*

The testimony of the supporting witnesses evidenced a desire for the improved service which Hennepin proposed. The testimony of the shippers implies that although overall service from protesting carriers is adequate, there is concern by the shippers about the growth of barge traffic and the increasing difficulty experienced in having an adequate number of barges timely placed by the plaintiffs.

The testimony of Allied Structural Steel Company typifies the supporting shippers' desire for improved service. Allied testified that it has received unsatisfactory service from Valley (343 I. C.C. at 434); and American Commercial Barge Line (ACBL), which was once

---

present tonnage, appear to have their services too overburdened to be able to secure

the well-documented future increases in regulated and unregulated barge traffic.

used by Allied, has informed this company that because of the demands and ACBL commitments, Allied must look elsewhere for service. Allied was not able to secure Federal to supply its barge needs. The witness for Allied admitted that it had not contacted Union Mechling for service. The testimony is typical of that presented by many other shippers. It conveys a clear desire for an improvement in service. By authorizing Hennepin's proposed service, the Commission determined in its discretion that it was wiser (and in the public interest) to assure the future shipping needs of a company like Allied, rather than leave them uncertain. And, as previously stated, the Commission need not wait for a barge crisis to authorize additional service.

Indussa Corporation (Indussa) is a steel importer, which uses regulated barge service on the inland waterways only when the St. Lawrence Seaway is frozen, usually from November to March. Like many steel importers, it permits the steamship company to arrange for a barge line to transport the steel from New Orleans to Chicago. Although Valley Line has been chosen by the steamship company, the witness complained that 40% of the time the shipments via Valley were at least a week delayed over estimated service time. (Tr. 673.) Indussa stated that if the applicant were authorized, it would request the steamship company to utilize Hennepin.

Kurt Orban Company's testimony provides another instance where not infrequent delays and leaky barges have injured the company's financial status. As another importer of steel, the company spokesman stated that the utilization of economical water transportation is essential in order for Orban to remain competitive with domestic producers and other importers. Orban has used Mechling's Chicago terminal which has caused frequent delays in the arrival of barges. Here again a supporting shipper desires improved service. (343 I.C.C. at 440–

441.) The witness indicated that some portion of the traffic Mechling ships would be likely diverted to the applicant due to the above-described congestion at the terminal.

Keystone Consolidated Industries also sounds a general call for the improvement of the barge service it has received. Keystone uses several shippers. Valley and ACBL receive the bulk of this company's traffic. Federal, the third choice of the witness, told the company that it could handle only one-third of its normal traffic load because barges were generally unavailable. Assenting to an overall adequacy of service by the carriers, the witness cited certain specific problems with delayed barges at its Peoria, Illinois, loading dock. (343 I.C.C. at 437.)

■ The foregoing testimony supports the conclusion that a real and general overall desire for improvement in barge service exists.

■ The last contention plaintiffs raise in disputing the application of *Nashua* to this decision states that *Nashua* must not be applied where the applicant is requesting to become a new entrant in the field. This argument appears to be based on the specific factual circumstances that existed in *Nashua*. This proposition is untenable because in Younger Brothers, Inc. v. United States, 289 F.Supp. 545, 548 (S.D.Tex.1966), the court relied on *Nashua* where protesting existing carriers were attempting to prevent new entrants in the field.

## VIII

*Has the Commission Failed to "Consider" the Cumulative Effect of the Four Grants Authorizing Service on Parts of the Mississippi River System?*

Plaintiffs' brief contends that the Commission has arbitrarily and capriciously failed to "consider" the cumulative impact to the protesting carriers caused by this grant to Hennepin and the three other grants of authority over

substantial portions of the Mississippi River System.[11] Plaintiffs' major point in this argument stresses the fact that by these four grants the number of regulated carriers on various portions of the Mississippi River System will be doubled; yet, it is asserted that the Commission's decision in Hennepin has given no consideration to the impact of the three other, nearly contemporaneous,[12] grants of authority. Plaintiffs argue that the Division's failure to consider the cumulative impact resulting from the three other certificates is a violation of the Commission's statutory obligation to give proper consideration to the public interest in its broad sense as § 309(c) of the Act requires.

Defendants dispute plaintiffs' contentions by asserting that the plaintiffs did not timely raise their proposition on cumulative impact before the Commission and that plaintiff Federal actually opposed a move by Security Barge to consolidate these four cases.

Plaintiffs' contention is identical to that raised in the Sioux City case. (343 I.C.C. at 412.) As defendants appropriately note, plaintiffs are in no position to claim that the Commission should have consolidated the four proceedings. Plaintiff Federal opposed Security Barge's second motion to consolidate (filed October, 1972) the four cases while they were pending before the Commission. (Reply of Federal to Security's motion to consolidate and reply of Federal to Security's petition for reconsideration of order denying consolidation, dated November 2, 1972 and December 8, 1972.) In its opposition to the motion to consolidate, Federal noted that the cases involve different parties, different issues, different existing carrier rights, and different potential geographic extensions. Curiously, while Federal actively opposed Security's move to consolidate the cases, the other plaintiffs took no position. While plaintiffs either opposed or took no position with respect to Security's motion to consolidate, Hennepin supported it.

It is thus clear, as plaintiffs concede in their brief, that they are not urging that the Commission should have consolidated or procedurally combined the four cases. Plaintiffs aver in their brief that they urged before the Commission that the cumulative impact be considered. Defendants dispute that plaintiffs ever "urged" such a proposition before the Commission. They believe that because plaintiffs failed to specify this proposition as an allegation of error in their petitions for reconsideration of the Commission's decision, the plaintiffs are now precluded from raising it here. United States v. L. A. Tucker Truck Lines, 344 U.S. 33, 36-37, 73 S.Ct. 67, 97 L.Ed. 54 (1952); Slay Transportation v. United States, supra, 353 F.Supp. at 558.

Defendant Hennepin is correct. The issue of cumulative impact is not raised specifically in any of the protestants' petitions for reconsideration of the Commission's decision. Cumulative impact is obliquely mentioned in the introductory comments in Union Mechling's petition for reconsideration (filed June 21, 1973). That this issue did not seem to

---

11. The three other grants of authority: (1) Sioux City and New Orleans Barge Lines, Inc., extension–Mississippi River System; Docket No. W–431 (Sub. No. 12), decided May 4, 1973, C.A. 73–956 in this Court; (2) The Ohio River Company Extension–Lower Mississippi River; Docket No. 414 (Sub. No. 8), decided July 20, 1973; (3) Security Barge Lines, Inc., Extension–Removal of Restriction; Docket No. W–1235 (Sub. No. 1), decided May 13, 1973.

12. The near contemporaneousness of the four decisions is undisputed. Plaintiffs' brief (p. 7) illustrates by a chart the comparative dates upon which each of the four cases moved through the I.C.C.'s various procedural levels. The chart reveals that the last case was filed (Security on May 4, 1971) with the I.C.C. prior to the termination of oral hearings in the first case filed by SCNO. The decisions reached by Division One in each of the four were served within a four-month span in 1973. (May 4 [SCNO], May 8 [Hennepin], July 20 [Ohio River], and September 13 [Security]).

be an important issue is evident from the fact that Mechling omitted any mention of the issue in its list of allegations of errors.

While it may be true that plaintiffs' petitions for reconsideration of the Hennepin grant do not argue the cumulative effect of the three subsequent cases, the petitions do note that the Sioux City case—served May 4, 1973—would cause more prejudicial impact on their proportionate share of regulated tonnage. The obvious reason why the plaintiffs did not mention either the Ohio River Company's application or Security Barge's application is that they were not decided until July and August of 1973. Plaintiffs, however, did contend that the Division's decision in Hennepin had failed to give proper consideration to the other three grants when they petitioned the I.C.C. for finding that the Hennepin application involved a matter of general transportation importance which necessitated the convocation of the entire Commission pursuant to I.C.C. Rule 101(4) on October 4, 1973.

There are several problems with plaintiffs' impact argument: (1) why did plaintiffs not mention this problem during the more than two years when these cases were before the I.C.C.; and (2) if consolidation is not requested, in what manner could the Commission properly consider the precise significance to be accorded the various different objectives, testimony and particularized circumstances presented in each of the four cases? Plaintiffs' argument before this court fails to provide any answers to these problems. Furthermore, the cases to which the plaintiffs refer the court do not advance their position.

Plaintiffs compare what they term the Division's "blinding failure to consider cumulative impact" herein to the error committed by the Commission in failing to consider the additional authority granted to competing carriers in Arkansas-Best Freight System v. United States, 364 F.Supp. 1239 (W.D.Ark. 1973). Plaintiffs also refer to certain language in United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 529, 66 S.Ct. 687, 90 L.Ed. 821 (1946), to support the above proposition.

In *Arkansas-Best Freight,* it should be noted that there the Division of the I.C.C. had reversed the Examiners and found that three of the ten motor carrier applications should be granted because there was a paucity of single service on the route. 364 F.Supp. at 1261. The Division's decision was suspended by the District Court (the court found that the Division had arbitrarily given more weight to the exhibits favorable to the applicants while not considering exhibits unfavorable to the applicants, and findings of the Division in its report were clearly contradicted by the factual data and an appendix to that report.)

The court noted that the Division relied on the quality of motor service available in 1966 for its 1971 report. In 1966 there was but one carrier on the route in question. At the time of the Division's decision, there were seven carriers on the particular route. Although the Division in *Arkansas-Best* acknowledged its duty to consider the recent grants of authority (the six additional certificates), it did not consider what action it had recently taken with respect to the application of one of the plaintiffs (West) for authority on the same route. The Division, on one hand, was willing to grant authority to three more applicants in *Arkansas-Best* (making a total of ten certified), yet, on the other hand, while the Division's decision in *Best* was pending on exceptions, it, in another proceeding, had denied the application of West (a plaintiff in *Best*) for authority on essentially the same points involved in *Best* on the sole ground that Mercury (another plaintiff in Best) had been already granted authority on the same route. It was this type of arbitrariness and capriciousness that caused the court in *Best* to suspend the Division's decision.

There are many distinguishing factors in the case *sub judice* which render the

*Best* case of little support for the plaintiff's contention: (1) in *Best*, the grant of authority which the Division failed to consider involved parties to the litigation (in this case the other three applicants are not parties); (2) in *Best,* the Division refused to grant the authority to plaintiff West while it employed the same reason to grant the three other applications (future growth is a reason advanced for the grant of the case *sub judice*; the improvement of service on the Missouri is the object of the grant in the Sioux City case, 343 I.C.C. 419; while the other grants have a different rationale; and (3) most importantly, in *Best*, the Division arbitrarily sifted the evidence in the record to favor the three applicants while it refused to consider unfavorable evidence.

As to the United States v. Pierce Auto Freight Lines, Inc., et al., the plaintiffs' brief refers us to the following passage:

> "The contention [that the Commission may not consider other pending cases] in its farthest reach amounts to a legal version of the scriptural injunction against letting one's right hand know what one's left may be doing. "Obviously it would be consistent neither with good sense nor, we think, with the type of hearing assured by the statute to force the Commission to put on such complete blinders." 327 U.S. at 529, 66 S.Ct. at 695.

The context in which the court renders the above statement must be analyzed. In *Pierce*, two motor carriers applied for certification to independently and in competition carry goods between San Francisco and Portland, Oregon. The applicants assumed, as did the District Court, that only one of their applications would be granted so each initially opposed the other's certification. The appellees' (competing carriers), who of course also opposed the certifications, principal cause of complaint before the Supreme Court was that the Commission did not consider each case exclusively on its own record but instead looked to the evidence in both proceedings in forming its judgment. The court noted that if

in fact the Commission were shown to have prejudicially considered evidence bearing on one case which did not affect it and was presented in the other, then the orders, or one of them, would be set aside. Finding the appellees had shown none of the above prejudice, and noting that much of the evidence was identical, and was made so by the parties' stipulations, it concluded that "the mere fact that the determining body has looked beyond the record proper does not invalidate its action unless substantial prejudice is shown to result." Id. 327 U.S. at 530, 66 S.Ct. at 695.

Plaintiffs cite this case for the proposition that the Division must look beyond the record (Hennepin record) to other pending cases in deciding matters of "public convenience and necessity" or else substantial prejudice will be done. This, of course, is not the rationale of *Pierce*: the case holds (in a case where all parties to two separate applications were present, involving the same desired authority, for essentially the same reasons) that the Commission may look beyond the record of the one case to the other in deciding on the applications as long as no prejudice resulted. *Pierce* can certainly not be cited for the proposition that the Division is mandated to look beyond the record before it to other cases which involve different parties seeking different grants of authority for distinct reasons.

It may be argued that the Division should have made direct reference to the other three pending applications in denying the petitions for reconsideration in this matter. However, the *Pierce* case surely does not mandate that consideration.

 Although it is true that the Commission's decision in Hennepin, as well as in Sioux City, omits any reference to the other pending cases, it cannot be said that such omission was arbitrary or capricious. Plaintiffs, as protestants in these cases, were aware of the potential impact the four cases could have on their operating authority. Plaintiffs do not explain why they waited

for over two years after all four cases were filed to finally raise the point. Defendant Hennepin suggests the plaintiffs made a tactical decision that it would likely be easier to defeat the four cases individually than to attack them in consolidated litigation. Considering these factors and the failure of the plaintiffs to refer to any case which effectively advances their contention, the court concludes that the Commission committed no reversible error. It may have been more desirable for the Commission to have considered in the case *sub judice*, (343 I.C.C. at 419), the cumulative impact. But in our review, we cannot say that such an omission was so arbitrary and capricious to require the decision to be annulled.

## IX

*Was the Decision Adequately Supported by a Statement of the Findings and Conclusions, and Reasons Therefor?*

The plaintiffs contend that the Commission's decision is not adequately supported by a statement of its findings, conclusions and reasons therefor. Specifically, plaintiffs argue that because the Commission's decision is a "clear reversal" of the prior I.C.C. policy of protecting existing carriers from new competition unless the carriers are not adequately serving a region, the reasons given for the Commission's decision do not sufficiently explain this "reversal" of prior policy.

This contention is reiteration of plaintiffs' previously discussed disagreement with the Commission's application of *Nashua* to this decision. For the reasons we have stated, we have determined that the adequacy of existing service is but one of many factors which are to be considered by the Commission.

## X

*The National Environmental Policy Act (NEPA) Question*

Following the issuance of the Commission's report and order of this matter in May, 1973, three of the plaintiffs (American Commercial, Dixie, and Union

Mechling) raised for the first time in their petitions for reconsideration of the Commission's decision the point that the I.C.C. had erred in deciding that its decision was not a "major Federal action[s] significantly affecting the quality of the human environment" within the meaning of the National Environmental Policy Act (NEPA) of 1969, 42 U.S.C. §§ 4331 et seq. (343 I.C.C. at 431.) The Commission's threshold determination that its decision was not governed by this Act meant that it was therefore unnecessary for the Commission to prepare an environmental impact statement as § 102(2)(C), 42 U.S.C. § 4332(2)(C) of NEPA requires of all federal agencies where the action is one which will significantly affect the quality of the human environment. Plaintiffs' argument appears to be an "after thought."

■ At the outset, it should be noted that this court's scope of review is essentially the same review which governs our review of the actual merits of the Division's report. This court upon review of the agency's threshold determination of the necessity of a NEPA statement must examine the facts to determine whether the decision was arbitrary, capricious, or an abuse of discretion, and decide whether the necessary procedural requirements were followed and then determine de novo "all relevant questions of law." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Hanly v. Kleindienst, 471 F.2d 823, 829 (2d Cir. 1972) cert. denied 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973).

In its order denying the petitions for reconsideration, the Commission expanded on the reasons for its decision that a NEPA statement was not required: (1) the Hennepin grant would not increase fuel consumption or commercial activity because the traffic will still require transportation (often by the plaintiffs); and (2) the denial of the application by Hennepin would have an adverse environmental impact inasmuch as (a) Hennepin would more likely be compelled to operate

tows on the Mississippi at less than peak capacity, thereby wasting fuel, and (b) during the times when the barge shortage is acute, shippers would be pressed to use more polluting forms of transportation (motor trucks) to move their goods.

 Two relevant factors which an agency should normally consider in deciding whether a NEPA statement is required are: "(1) the extent to which the action will cause adverse environmental effects in excess of those created by existing uses in the area affected by [the decision], and (2) the absolute quantitative adverse environmental effects of the action itself, including the cumulative harm that results from its contribution to existing adverse conditions or uses in the affected area." See Hanly v. Kleindienst, supra, 471 F.2d at 830–831. Applying these two considerations to the case, the Commission's decision that an environmental impact statement is not necessary appears justified. The grant of authority to Hennepin will not enable that carrier to travel on any rivers upon which it does not now travel as an unregulated carrier. As previously noted, the certificate here addresses regulated water traffic, which all parties concede constitutes no more than 4% of the totality of tonnage moved on our inland waterways. Rather than serving new waterways, Hennepin merely proposed to serve the same waterways more efficiently as a regulated, as well as an unregulated carrier. It is difficult to imagine how this grant which would enable Hennepin to more promptly and efficiently fill out tows, thereby conserving gasoline, could be viewed as detrimental to our environment in a time when the nation is seeking any new way in which to utilize more efficiently its energy resources.

## XI

### CONCLUSION

As pointed out in the foregoing opinion, the findings of the Commission are supported by substantial evidence.

An appropriate order will be entered.